**VINGCARD A.S. and Vingcard Systems, Inc., Appellants,**

v.

**MERRIMAC HOSPITALITY SYSTEMS, INC.,**
Appellee.

No. 2–00–132–CV.

Court of Appeals of Texas,
Fort Worth.

Nov. 15, 2001.

Cowles & Thompson, P.C., and Charles T. Frazier, Jr., Gregory J. Lensing, and Shawn M. McCaskill, Dallas, for appellant.

Kelly, Hart & Hallman, P.C., and Dee J. Kelly and Brian S. Stagner; Reynolds & Pennington, L.L.P. and H. Allen Pennington, Jr.; Goodrich Postnikoff & Albertson, L.L.P. and Michael S. Goodrich, Fort Worth, for appellee.

Panel B: LIVINGSTON, HOLMAN, and GARDNER, JJ.

## OPINION ON REHEARING

TERRIE LIVINGSTON, Justice.

After reconsidering our prior opinion upon appellants' motion for rehearing, we deny the motion for rehearing, withdraw our August 9, 2001 opinion and judgment, and substitute the following in their place. This revised opinion clarifies the discussion on attorney's fees.

### INTRODUCTION

This is a suit brought by appellee, Merrimac Hospitality Systems, Inc., against appellants, VingCard a.s. ("VingCard") and VingCard Systems, Inc. ("VCI"), for economic damages based on claims for breach of contract, tortious interference with contract, conspiracy, and fraud. The trial court entered judgment in accordance with the jury's findings in favor of Merrimac. VingCard and VCI appeal the trial court's judgment. In nine issues, VingCard and VCI complain about the: admission of expert testimony; legal and factual sufficiency of the evidence of lost profits; award of attorney's fees; factual sufficiency of the evidence of breach of contract, fraud, and tortious interference; the trial court's refusal to submit their requested jury issue on excuse and their tortious interference instruction; and the jury's failure to make an affirmative finding on its good faith belief defense to tortious interference. We affirm the trial court's judgment.

### FACTUAL BACKGROUND

**Vision Workstation Design and Production Agreement**

VingCard is a corporation based in Norway, which manufactures and distributes codable hotel door locks and keys. VCI is a distributor of VingCard's products in North America. Merrimac is a Texas corporation that develops and produces touch-screen computer workstations.

In 1995, VingCard and Merrimac began discussions about developing a computer workstation, called Vision, for use at hotel front desks. The envisioned workstation

would have a touch screen, would perform administrative tasks, such as registering guests and processing payments, and would have a built-in encoder for coding the hotel room keys to the locks.

In May 1996, VingCard entered into a "Work Station Design & Production Agreement" with Merrimac to produce the Vision computer workstation. Specifically, Merrimac was to design, develop, and manufacture a touchscreen-based workstation, which would encode and read magnetic stripes such as those on VingCard's hotel door keys, and read the magnetic stripe on standard credit cards. Under the workstation agreement, VingCard agreed that Merrimac would be the exclusive manufacturer of the workstations based on the designs developed under the workstation agreement. VingCard also gave Merrimac exclusive rights to market the new workstation to all worldwide industries other than the hotel and security sectors.

Pursuant to the agreement, Merrimac was to ship the completed Vision workstations within 120 days of receiving VingCard's purchase order, and would deduct a 1% discount per week with respect to any unit not timely shipped. So that Merrimac could plan its purchasing and production and ensure that it had time to process and ship orders within 120 days, VingCard agreed to provide Merrimac with rolling annual estimates of the number of workstations it intended to purchase. Merrimac warranted that its products would conform to specifications and that if it could not correct any nonconformance within 30 days it would credit VingCard with the purchase price. VingCard had the right to terminate the agreement at any time if Merrimac "for any reason, [did] not fulfill" the agreement and did not cure the breach within a "reasonable amount of time."

Merrimac began developing the Vision workstation, with a target production date set for the end of 1996. In developing the workstation, Merrimac outsourced several design and manufacturing tasks to third parties. It selected CapRock Manufacturing to supply the molds and tools, and Diamond Flower Electric Instrument, Inc. ("DFI") as contract manufacturer to assemble the product. In November 1996, Merrimac furnished VingCard with a working prototype of the Vision workstation, which VingCard approved. VingCard also announced its intent to acquire 1500 units in the coming year.

In late 1996, VingCard ordered the first shipment of 300 units. Merrimac invoiced VingCard for these units on December 2, 1996, making delivery due by April 1, 1997. Problems and delays arose. Merrimac shipped the first twenty-five units on May 21, 1997.

VingCard ordered another 250 units on July 7, 1997. These units were due approximately November 7, 1997. Merrimac continued producing and delivering several more units from VingCard's first order, with several of these units also experiencing problems. In September 1997, VingCard ordered Merrimac to stop production and sent representatives to meet with Merrimac.

**The Quality Assurance Amendment**

Following this meeting, the parties entered into another agreement, referred to as the "quality assurance amendment." The amended agreement set forth the areas where the Vision units had failed and specified that 7% was the maximum acceptable failure or "DOA" rate for the units—defined as any unit which, when received by VingCard, failed to operate or was missing peripherals required for full functionality. The parties further specified that if Merrimac failed to restore normal shipments that met the 7% DOA stan-

dard by October 31, 1997, VingCard would be entitled to invoke the original contract's termination-for-cause provision, and that Merrimac's reasonable time to cure the specific failure would be ten weeks. The parties mutually agreed to extend the October 31 deadline until November 21 or 24.

**Termination of the Vision Workstation Agreement**

In November 1997 and February 1998, VingCard notified Merrimac it was in breach of the quality assurance amendment, setting a final cure deadline of March 15, 1998. In February 1998, VingCard also placed an order for 300 more units, expressly reserving its rights under the workstation agreement. The March 15 cure deadline passed, with VingCard making no further breach allegations or cure demands.

Throughout 1998, Merrimac continued producing and shipping the Vision workstations and performing warranty work on defective units. As of April 14, 1998, Merrimac had completed the December 1996 order, although it still owed VingCard 81 units from the July 1997 order. On April 28, 1998, VingCard ordered another 255 units, bringing the total ordered to 1,105 units. VingCard also ordered another 64 units in August 1998.

However, throughout 1998, VingCard's internal documents showed it was planning to terminate its agreement with Merrimac and get Merrimac out of the manufacturing loop. These internal documents also showed VingCard was communicating and meeting with DFI about terminating the workstation agreement with Merrimac and developing a direct relationship with DFI.

On October 16, 1998, VingCard terminated its agreement with Merrimac and cancelled all outstanding orders. VingCard then entered into an agreement directly with DFI as its new Vision unit manufacturer. As a result, Merrimac lost its exclusive manufacturing rights to the Vision workstation and its exclusive right to market the new workstation to other industries.

**Merrimac's Marketing Agreement with Ibertech and the Aloha Workstation**

While producing the Vision workstation, Merrimac explored other potential markets for its Vision-based workstations, as anticipated under the workstation agreement. Merrimac found Ibertech, Inc., a designer and distributor of touch-screen software for the food service industries. In September 1998, Merrimac and Ibertech executed a marketing agreement, whereby Merrimac would produce a restaurant-compatible computer workstation called "Aloha," which would resemble its Vision workstation design. Ibertech would then market the Aloha workstation and its software to its customers under the Ibertech name. Merrimac was to receive set amounts for each Aloha workstation sold to resellers and each sold directly to Ibertech.

In preparation for producing the Aloha workstations, Merrimac made arrangements to use the plastic molds built by CapRock for the Vision units. However, when VingCard terminated Merrimac as manufacturer of the Vision workstation, Merrimac lost its exclusive manufacturing and marketing rights to the workstation. VingCard refused to give Merrimac access to the Vision molds, requiring CapRock to sign an agreement not to produce or deliver any additional plastic parts using the molds without VingCard's written consent. VingCard's actions prevented Merrimac from performing under the Ibertech marketing agreement. As a result, the agreement with Ibertech and the Aloha product were never fully realized.

**PROCEDURAL BACKGROUND**

Merrimac brought suit against VingCard and VCI. Merrimac alleged

VingCard breached the workstation agreement by its October 16, 1998 termination letter. Merrimac also brought claims against both VingCard and VCI for tortious interference with its various contracts and conspiracy.[1] Merrimac sought lost profits, attorney's fees, and punitive damages.

VingCard brought a counterclaim against Merrimac and Tony Formby, Merrimac's president, asserting claims for breach of contract and fraud based on Merrimac's repeated failure to produce quality workstations and timely deliver them as represented. VingCard sought economic and punitive damages, as well as attorney's fees.

The jury found in favor of Merrimac on its claims and denied VingCard any relief on its counterclaims. The jury awarded Merrimac $600,000 in past lost profits, $10,000,000 in future lost profits, $2,067,000 for trial attorney's fees, and over twice that amount for appellate attorney's fees. The jury awarded $1.00 in punitive damages. The trial court reduced the appellate attorney's fees and entered judgment against VingCard and VCI, jointly and severally, for $12,736,699. Following the denial of their motion for new trial, VingCard and VCI appeal the trial court's judgment.

## ANALYSIS

### Admission of Expert Testimony

In issue one, VingCard and VCI contend the trial court erred in allowing Merrimac's expert, David Puzas, to testify on projected lost sales because his opinions were not disclosed during discovery in compliance with rule 194.2(f) of the Texas

Rules of Civil Procedure. Tex.R. Civ. P. 194.2(f).

Puzas was Ibertech's director of marketing. In its amended disclosure responses, Merrimac identified him as an expert witness who would provide an opinion regarding the future projected sales of the Aloha unit and the damage to Merrimac's industry reputation. At trial, VingCard and VCI objected to the admission of Puzas' testimony regarding projected lost sales of the Aloha unit on the basis that Merrimac had not complied with rule 194.2(f). The trial court overruled their objection. Puzas then testified he projected capturing approximately one-third of Ibertech's annual sales with the Aloha workstation. He also testified regarding the basis for that projection: Ibertech's status in the market, its past and current sales information, and its marketing plans for the Aloha workstation.

VingCard and VCI argue that, although Merrimac properly identified Puzas in its disclosure responses and identified the subject matter on which Puzas might be called to testify, Merrimac did not disclose his mental impressions and opinions, nor a brief summary of the basis for those opinions. Therefore, VingCard and VCI claim the trial court erred in admitting Puzas' testimony over their objection because rule 193.6 requires exclusion of evidence that is not disclosed during discovery, absent a showing of good cause or lack of unfair surprise or prejudice, which Merrimac did not show. *Id.* 193.6(a).

Merrimac argues that VingCard's and VCI's issue goes to the *adequacy* of its disclosures, not its failure to respond, and that only a complete failure to disclose

---

1. Merrimac also brought claims for common law fraud in requiring Merrimac to assign its patent right to the product designs, business disparagement, economic duress, and breach of the duty of good faith and fiduciary duties. The trial court granted a directed verdict in favor of VingCard on all of these claims.

warrants exclusion of evidence under rule 193.6.

We review the trial court's decision relating to discovery sanctions under an abuse of discretion standard. *Bodnow Corp. v. City of Hondo*, 721 S.W.2d 839, 840 (Tex.1986); *Prudential Prop. & Cas. Co. v. Dow Chevrolet–Olds, Inc.*, 10 S.W.3d 97, 103 (Tex.App.—Texarkana 1999, pet. dism'd). A trial court abuses its discretion if it acts without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). In reviewing the trial court's decision, we must determine whether the trial court's action was arbitrary or unreasonable. *Id.* at 242.

With regard to a testifying expert, rule 194.2(f) permits a party to request disclosure of "the general substance of the expert's mental impressions and opinions and a brief summary of the basis for them." TEX.R. CIV. P. 194.2(f)(3). Additionally, when the expert is employed by the responding party, as in this case, the party may request disclosure of "all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony." *Id.* 194.2(f)(4)(A).

Rule 194.3 requires the responding party to serve a written response on the requesting party. *Id.* 194.3. A response to a request for disclosure under rule 194.2(f) regarding testifying experts is governed by rule 195. *Id.* 194.3(b). Rule 195 provides that a party must timely designate experts by "furnish[ing] information requested under [r]ule 194.2(f)." *Id.* 195.2.

A party's duty to amend and supplement written discovery regarding a testifying expert is governed by rule 193.5. *Id.* 195.6. That rule provides that

. . . a party must amend or supplement the response:

(1) to the extent that the written discovery sought the identification of persons with knowledge of relevant facts, trial witnesses, or expert witnesses, *and*

(2) *to the extent that the written discovery sought other information,* unless the additional or corrective information has been made known to the other parties in writing, on the record at a deposition, or through other discovery responses."

*Id.* 193.5(a) (emphasis added). The amended or supplemental response must be made "reasonably promptly after the party discovers the necessity for such a response." It is presumed that an amended or supplemental response made less than thirty days before trial was not made reasonably promptly. *Id.* 193.5(b). A party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed, unless there is good cause for such failure or the failure to disclose will not unfairly surprise or prejudice the other parties. *Id.* 193.6(a).

VingCard's and VCI's request for disclosure sought "the information or material described in [r]ule 194.2(a)-(i)," which included all items listed under rule 194.2(f). In response, Merrimac provided only Puzas' name and the subject matter on which he would testify, the projected future sales of the Aloha unit. However, VingCard's and VCI's request sought more than this. Per their request and the rules, Merrimac was required to also provide the general substance of Puzas' mental impressions and opinions and a brief summary of the basis for them. *See id.* 194.2(f)(3). Additionally, Merrimac was required to provide

any documents, data, or reports provided to Puzas, reviewed by him, or prepared by or for him in anticipation of his testimony. *See id.* 194.2(f)(4). Merrimac provided none of this information.

Merrimac relies on *State Farm Fire & Casualty Co. v. Morua,* 979 S.W.2d 616 (Tex.1998), and *$23,900 v. State,* 899 S.W.2d 314 (Tex.App.—Houston [14th Dist.] 1995, no writ), to support its contention that its responses were merely *inadequate,* and not a failure to respond, which is insufficient to trigger the automatic exclusion sanctions of rule 193.6. Each of these cases, however, found sanctions inappropriate where the responses were not verified and the lack of verification was raised for the first time at trial. *Morua,* 979 S.W.2d at 619–20; *$23,900,* 899 S.W.2d at 317–18. Thus, a missing verification formed the basis for the inadequacy referred to in each of these cases, not a failure to respond or supplement discovery. In fact, *Morua* expressly distinguishes a failure-to-verify case from a case involving a complete failure to respond to discovery. *Morua,* 979 S.W.2d at 620. While an issue was raised in *$23,900* about the adequacy of information provided in a response, we also find those facts distinguishable from a complete failure to disclose. *$23,900,* 899 S.W.2d at 316 (holding that police officer was properly identified where he could be contacted through the information identified even though it was not his correct station information).

Merrimac also relies upon *Garza v. Tan,* 849 S.W.2d 430 (Tex.App.—Corpus Christi 1993, no writ), claiming the court held that the precise type of information provided by Merrimac was sufficient to comply with former rule 166b(6)(b), which is now rule 193.5. While this may have been sufficient under former rule 166b(6)(b), current rule 193.5 requires more. Under former rule 166b(6)(b), if a testifying expert witness had not been disclosed in response to an appropriate inquiry, a party was required to supplement its response with the identity of any expert witness and the substance of the testimony about which the expert is expected to testify. *See* Tex.R. Civ. P. 166b(6)(b), 666–667 S.W.2d L–LI (1984, repealed 1998). Current rule 193.5 requires a party to not only amend or supplement the expert's identity and subject matter of his testimony, but also provide any "other information" sought by written discovery. Tex.R. Civ. P. 193.5(a)(2). We find *Garza* inapplicable to this case.

◾ We, therefore, disagree with Merrimac's contention that its responses were merely *inadequate.* Rather, Merrimac wholly failed to respond to VingCard's and VCI's request to disclose Puzas' mental impressions and opinions, to provide a brief summary of the basis for his opinions, or to provide any of the tangible information reviewed by Puzas in anticipation of his testimony. Rules 195.2 and 193.5(a) placed the affirmative obligation on Merrimac to provide the requested information in either its original or its amended responses. *Id.* 193.5(a), 195.2; *see Sharp v. Broadway Nat'l Bank,* 784 S.W.2d 669, 671–72 (Tex.1990) (stating that party has no duty to remind another party to abide by the rules of civil procedure). Its failure to do so, absent a showing of good cause or lack of surprise or prejudice, triggers the automatic exclusion sanctions of rule 193.6. Merrimac made no attempt to establish good cause, lack of surprise, or lack of prejudice. We conclude Merrimac failed to provide disclosure responses in accordance with rules 195.2 and 193.5. Tex.R. Civ. P. 193.5(a), 195.2.

Merrimac also contends VingCard and VCI waived any objection to Puzas' testimony by failing to raise the disclosure issue until trial, citing *Interceramic, Inc. v. South Orient Railroad Co.,* 999 S.W.2d 920

(Tex.App.—Texarkana 1999, pet. denied). *Interceramic*, however, is distinguishable. *Interceramic* dealt with the timeliness of an expert report. Interceramic received the report before trial, but waited until the expert was brought to the stand at trial to object to the admission of his testimony based on the failure to timely supplement discovery responses with the expert's report. *Id.* at 929–30. The court found the defect was not a complete failure to respond to discovery, and therefore, Interceramic's failure to object before trial waived any complaint. *Id.* at 930.

■ Unlike *Interceramic*, there is no timeliness issue in this case. As we have already concluded, Merrimac completely failed to supplement its disclosure responses in accordance with rule 193.5(a)(2). Therefore, VingCard's and VCI's trial objections to the admission of Puzas' testimony on future sales is sufficient to preserve error. *See Sharp*, 784 S.W.2d at 671. Accordingly, we hold the trial court erred in admitting Puzas' testimony regarding projected future sales of the Aloha unit over VingCard's and VCI's objections.

In order to constitute reversible error, however, the trial court's error in the admission or exclusion of evidence must have probably caused an improper judgment. Tex.R.App. P. 44.1(a)(1); *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989). Merrimac argues Puzas' testimony is merely cumulative to that of its president, Tony Formby, and therefore, any error in admitting Puzas' testimony does not amount to reversible error.

VingCard and VCI admit Formby also testified regarding lost sales. However, they contend the trial court erred in admitting Formby's testimony over their objections because Formby was not competent to testify about probable Aloha sales as he was not an employee of Ibertech and did not provide any factual basis for his speculations regarding how many Aloha units could have been sold. Therefore, we first address the admissibility of Formby's testimony in order to determine whether it was cumulative of Puzas' testimony.

■ Formby testified he has more than twenty years' experience in designing, manufacturing, and marketing touch-screen technology, as well as experience in the restaurant industry. He previously owned and served as operating partner of three restaurants. He then helped found a company that developed, produced, and marketed the "first touch-screen based point-of-sale ... system" for the restaurant industry, known as the Squirrel system. The Squirrel was a fully integrated restaurant management system that operated both as an electronic menu and cash register, which became very successful. Formby established Merrimac to continue developing touch-screen computer technology, primarily for the hospitality industry. Through Merrimac, he designed another touch-screen PC, developed and sold point-of-sale software to a large manufacturer of cash registers, and served as marketing consultant for the world's largest computer terminal manufacturer. Formby has spoken at technology conferences geared toward the hospitality industry, serving as a leader of the conference in 1995, and has had articles published about him, primarily with respect to his development of the Squirrel system and its success.

Formby testified he had known the principals of Ibertech for many years before entering into the marketing agreement with Ibertech. He watched their development throughout the year preceding the agreement and saw them become the largest selling restaurant point-of-sale company in the United States. He began discussing the initial concept for the Aloha workstation with Ibertech in 1997, and be-

gan working together with Ibertech in the summer of 1998.

Under the Ibertech contract, Formby testified that the projected plan was to capture one-third of Ibertech's workstation sales that were occurring through its resellers, which translated into 5,000 Aloha units per year. The projected goal was based on Ibertech's existing market in the restaurant industry, its huge world-wide sales force, its extensive marketing of the Aloha product, and Ibertech's existing customer base and predictable number of existing sales. Ibertech had 120 of the nation's best industry resellers, located all over the world, already working for it selling the Ibertech software. Many of these resellers had been in business thirty or forty years and "owned" their respective geographical markets. Ibertech also marketed the Aloha product to its resellers, and through conferences, trade shows, advertisements in large trade publications, and brochures. When he entered into the Ibertech contract, Formby testified Ibertech had an existing ten to fifteen thousand customer sales per year with a very fast growth rate.

Formby further testified that, under the Ibertech contract, between forty and fifty Aloha units were actually produced, sold, and in use. The units were also profitable. Each unit sold for approximately $2100, with production costs running about $1800 for each unit, with a resulting profits of approximately $350 per unit.

In light of Formby's experience and knowledge in the touch-screen computer technology and restaurant industries, his personal knowledge, and his dealings with Ibertech and its principals, we conclude Formby was competent to testify about probable Aloha sales and that his projections were not speculative, but rather based on objective facts and information.

VingCard and VCI contend, in the alternative, that even if Formby was competent to testify on lost sales, the admission of Puzas' testimony on the same subject was still harmful error. They argue Puzas was an uninterested witness with superior knowledge about Ibertech's operations and customer base and was "far more impressive ... undoubtedly enhanc[ing] the credibility of Merrimac's claim," which probably caused the jury to render a greater amount of past and future lost profits. In support of their argument, VingCard and VCI rely on *Bauer v. Riggs*, 649 S.W.2d 347 (Tex.App.—Fort Worth 1983, writ ref'd n.r.e.) and *Reichhold Chemicals, Inc. v. Puremco Manufacturing Co.*, 854 S.W.2d 240 (Tex.App.—Waco 1993, writ denied).

The controlling issue in *Riggs* was whether Riggs and the deceased had executed an agreement whereby Riggs released all of his interest in certain real property. *Riggs*, 649 S.W.2d at 350. There was circumstantial evidence from third-party, disinterested witnesses that they had heard Riggs or the decedent state they were partners with respect to the property, and that none of the witnesses had ever seen or heard of any release agreement. However, the only *direct* testimony that Riggs did not sign the release agreement came from Riggs himself. Under these facts, this court held that the circumstantial evidence paled in significance to Riggs direct testimony, and that the erroneous admission of his testimony was prejudicial and probably caused an improper verdict. *Id.* at 353.

In this case, Formby's testimony was not mere circumstantial evidence. Formby was familiar with Ibertech and its principals, and he personally negotiated the marketing agreement with Ibertech. Through both his knowledge of the industry and in the course of his dealings with

Ibertech, he gained direct knowledge about Ibertech's sales market and its projected market for the Aloha unit. Additionally, Merrimac had already produced and sold between forty and fifty units that were in use. Thus, Formby provided direct testimony about the existing market, market projections, and the existing viability of the Aloha unit. We find *Riggs* unsupportive of VingCard's and VCI's argument.

We also find *Reichhold Chemicals* distinguishable from the facts in this case. In that case, the plaintiff relied heavily on the erroneously admitted expert testimony regarding lost profits. Additionally, most of the lost-profit damage calculations relied on by that plaintiff were those of the expert. Under those facts, the court held the expert's testimony probably influenced the jury's verdict, and, therefore, the error in admitting it was harmful. *Reichhold Chems.*, 854 S.W.2d at 249.

Here, while Merrimac may have relied on Puzas' testimony, it also relied on Formby's testimony. Merrimac also provided evidence of lost profits through its expert economist, Dr. Allen Self, whose estimations were significantly higher than those shown by Puzas' and Formby's testimony. The jury's award for lost profits exceeded those shown by Puzas' and Formby's testimony, but were less than Dr. Self's projected estimates. While the jury may have found Puzas' testimony credible because he was directly associated with Ibertech, we cannot say under these facts that his testimony alone probably affected their verdict. As we have already noted, Formby established his own industry experience, his knowledge about Ibertech's sales market, his direct dealings with Ibertech, and existing Aloha unit production and sales. Formby's testimony was based directly upon his own research, knowledge, and dealings with Ibertech and

was cumulative of Puzas' testimony. When the complained-of testimony is cumulative, then any error in its admission is harmless. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 230 (Tex.1990); *Gee*, 765 S.W.2d at 396. We conclude that the trial court's error in admitting Puzas' testimony on lost Aloha sales did not constitute harmful error. We overrule VingCard's and VCI's first issue.

## Legal and Factual Sufficiency of the Evidence

In issues two, five, eight, and nine, VingCard and VCI complain of the legal and factual sufficiency of the evidence.

In determining a "no-evidence" issue, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Cont'l Coffee Prods. v. Cazarez*, 937 S.W.2d 444, 450 (Tex.1996); *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). If there is more than a scintilla of such evidence to support the finding, the claim is sufficient as a matter of law. *Cazarez*, 937 S.W.2d at 450; *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex.1996).

A "no-evidence" issue may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex.1998) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evi-*

dence" *Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960)). There is some evidence when the proof supplies a reasonable basis on which reasonable minds may reach different conclusions about the existence of the vital fact. *Orozco v. Sander*, 824 S.W.2d 555, 556 (Tex.1992).

When a party without the burden of proof on an issue challenges the factual sufficiency of the evidence, the question is whether insufficient evidence supports the complained of finding. *Gooch v. Am. Sling Co.*, 902 S.W.2d 181, 184 (Tex.App.—Fort Worth 1995, no writ). An assertion that the evidence is "insufficient" to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

When a party challenges the factual sufficiency of the evidence on an issue where that party has the burden of proof, the question is whether the fact finder's failure to make a finding is against the great weight and preponderance of the evidence. *Gooch*, 902 S.W.2d at 184. We may sustain an issue only if a finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust. *Watson v. Prewitt*, 159 Tex. 305, 320 S.W.2d 815, 816 (Tex.1959); *In re King's Estate*, 244 S.W.2d at 661.

In reviewing both of these factual sufficiency issues, we are required to consider all of the evidence in the case. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.), *cert. denied*, 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998); *Ames v. Ames*, 776 S.W.2d 154, 158–59 (Tex.1989), *cert. denied*, 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 939 (1990); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

### Breach of Contract

In issue five, VingCard complains of the jury's affirmative finding that VingCard breached the contract and its failure to find that VingCard's breach was excused by Merrimac's prior breach of the contract.[2] Specifically, VingCard contends the evidence is factually insufficient to support the jury's finding that it breached the contract because the great weight and preponderance of the evidence establishes Merrimac "repeatedly breached the [a]greement" by failing to: deliver working units, deliver the units on time, give VingCard the stipulated discounts, and to perform quality and timely warranty service. Therefore, based on the terms of the agreement, VingCard argues it had the "right to terminate the [a]greement," and that the jury's finding that it breached the agreement was not supported by factually sufficient evidence.

The only issue the jury considered in determining VingCard breached the contract was whether VingCard's "termination of the contract dated May 23, 1996 as amended by the October, 1997 [quality assurance] amendment [was] done in violation of the terms of such contracts." The original contract contained a termination provision, which provided:

> If [Merrimac], for any reason, does not fulfill this agreement, [Merrimac] will be given a reasonable amount of time to cure the non-fulfilling element. If [Merrimac] does not cure the non-fulfilling element, the agreement may be canceled....

The quality assurance amendment, expressly referring to this provision, set the reasonable amount of time to cure a non-fulfilling element at ten weeks.

---

**2.** Only VingCard was found liable for breach of contract.

There was substantial evidence presented at trial regarding both VingCard's and Merrimac's performance under the contract. There was evidence that Merrimac failed to timely produce and ship the Vision units to VingCard as provided under the agreement. VingCard also established it did not receive its one percent per week discount for the late deliveries. However, the evidence also showed VingCard failed to submit quarterly purchase estimates as required by the contract, which were critical to Merrimac's production planning. Merrimac further established that, although VingCard required VCI to submit rolling estimates every three or four months, VingCard did not provide these estimates to Merrimac. The jury could infer from this evidence that VingCard's failure to submit the required quarterly purchase estimates was not inadvertent and that VingCard intentionally jeopardized Merrimac's ability to timely produce the Vision units. The evidence also showed that VingCard either failed to pay or withheld payments for delivered units, which Merrimac claimed and the jury could have believed, hampered Merrimac's production.

With regard to VingCard's and VCI's complaint about Merrimac's failure to deliver working units, there was evidence, including VingCard's own internal documents, that showed Merrimac delivered products within the seven percent failure rate specified in the agreement. Thus, despite evidence of the problems encountered with delivered units, the jury was free to conclude from the evidence that Merrimac was in compliance with the workstation agreement.

With regard to the quality and timeliness of Merrimac's warranty work, there was evidence that it was VingCard who placed DFI in charge of the warranty work. The jury found both VingCard and VCI conspired with DFI to interfere with Merrimac's contractual relationships pertaining to the Vision unit. VingCard does not challenge the jury's conspiracy findings, except to state that "[o]nce the tortious interference findings ... are set aside," the conspiracy findings are "immaterial." Because, as shown below, we decline to set aside the jury's tortious interference findings, the jury was free to infer that any deficiencies in the warranty work was due to a conspiracy by VingCard and DFI to interfere with Merrimac's quality production and service of the Vision units.

We further note that, despite VingCard's complaints about Merrimac's performance throughout the contract term and its termination and cure notices of November 1997 and February 1998, VingCard made no further termination or cure demands after the March 15, 1998 cure deadline and continued ordering Vision units from Merrimac. The evidence shows VingCard placed additional orders with Merrimac in April 1998 for 255 units, and as late as August 1998 for another 64 units. Formby testified that Merrimac owed VingCard about 300 units when VingCard terminated the agreement. VingCard claimed most of these units were a "minimum of seven weeks overdue under the [a]greement" at the time it terminated the agreement. However, the jury could determine from this evidence that Merrimac had cured all non-fulfilling elements that existed prior to the April 1998 order, and that VingCard had not complied with the workstation agreement by giving Merrimac notice and a reasonable time to cure the overdue units before terminating the agreement.

Considering these facts and the record as a whole, we conclude that the jury's failure to find VingCard's breach was excused by Merrimac's prior breach was not against the great weight and preponder-

ance of the evidence, and that the jury's finding that VingCard breached the contract is supported by factually sufficient evidence.

VingCard also contends that the jury's failure to find that Merrimac committed fraud was against the great weight and preponderance of the evidence. VingCard relies on its breach of contract arguments to show that Merrimac was unable to live up to its representations in numerous respects.

We have already held the evidence factually sufficient to support the jury's finding that VingCard breached the agreement. Therefore, the jury could have found that Merrimac either lived up to its representations, or that VingCard's actions prevented it from doing so. Accordingly, we cannot say that the jury's failure to find Merrimac committed fraud against VingCard is against the great weight and preponderance of the evidence. We overrule VingCard's fifth issue.

**Tortious Interference**

In their eighth issue, VingCard and VCI contend the evidence is factually insufficient to support the jury's tortious interference findings.

The jury found both VingCard and VCI tortiously interfered with each of the four contractual relationships Merrimac had with DFI, CapRock, Ibertech, and VingCard. With respect to Merrimac's contracts with Ibertech and CapRock, VingCard and VCI argue that because VingCard was entitled to terminate the agreement due to Merrimac's breach, then its excluding Merrimac from using the molds could not be wrongful or tortious, regardless of the affect it had on Merrimac's business relations with Ibertech or CapRock. With respect to Merrimac's contract with DFI, VingCard and VCI argue that once Merrimac breached the agreement, VingCard was within its rights

to deal directly with DFI. Each of these arguments is premised upon an affirmative finding that VingCard did not breach the agreement. Because we have upheld the jury's breach of contract finding against VingCard, we reject these arguments.

VingCard and VCI further argue that neither VingCard, as a party to the contract, nor VCI, as VingCard's sister corporation, are legally capable of interfering with the Merrimac/VingCard contract. Because we have upheld the jury's tortious interference findings with respect to Merrimac's contracts with DFI, CapRock, and Ibertech, and the jury's breach of contract finding against VingCard, and these findings support the jury's award for lost profits, we need not address these arguments. *See* TEX.R.APP. P. 47.1. We overrule issue eight.

**Lost Profits**

In issue two, VingCard and VCI contend the evidence is legally and factually insufficient to support the jury's $10.6 million lost profits award because Merrimac did not prove lost profits with reasonable certainty.

The jury's award for lost profits was based on two sources of profits: projected sales of the VingCard Vision unit, and projected sales of the Ibertech Aloha unit. VingCard and VCI contend, with respect to lost profits in general, that Merrimac was historically an unprofitable company, with nothing in its history indicating it was capable of generating $10 million in profits. Thus, VingCard and VCI claim Merrimac was virtually a "new enterprise" with respect to establishing lost profits, which requires "firmer reasons" for establishing business profit expectations that were not shown. VingCard and VCI further contend Merrimac's evidence on lost profits was based on pure speculation and not on objective facts and data. VingCard

and VCI also make various separate arguments with respect to the two products. For clarity, we will review the evidence separately with regard to each product.

■ A party seeking recovery for lost profits must prove those profits by competent evidence with reasonable certainty. *Ishin Speed Sport, Inc. v. Rutherford,* 933 S.W.2d 343, 350 (Tex.App.—Fort Worth 1996, no writ). This means that, at a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. *Id.* at 350–51.

■ The Texas Supreme Court has emphasized that the requirement that lost profits be proved with reasonable certainty is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise. *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.,* 877 S.W.2d 276, 279 (Tex.1994). "Reasonable certainty" is not demonstrated when the profits claimed to be lost are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unproven enterprises. *Id.* However, when there are firmer reasons to expect a business to yield a profit, recovery for profits allegedly lost will not be denied simply because the business is new. *Id.* at 280. The focus is on the experience of the persons involved in the enterprise, the nature of the business activity, and the relevant market. *Id.*

### The Vision Product

Formby testified that because of his experience and reputation in the industry, VingCard approached him for the design and manufacture of the Vision workstation. Both he and VingCard estimated that sales of the Vision product would reach 2,500

units a year, for a total expected profit revenue of $3 to $3.5 million. He stated this was a conservative estimate based on the first years' production of about a hundred units per month. Formby also noted that VingCard itself estimated it would purchase 1,500 units during the first year, and did purchase almost 1,000 units despite the problems between it and Merrimac. Additionally, VingCard was selling 2,500 units a year of its older hotel-desk models, which Formby stated would likely have been replaced with the Vision product. Formby's projections also took into account VingCard's sheer size and marketing capabilities, VingCard's aggressive worldwide sales force, its 50% world market share on hotel electronic door locks, and the fact VingCard could be selling 10,000 units per year based on its existing market and customer base. VingCard's own promotional materials supported these facts given by Formby. Finally, Formby based his five to ten year market life projection of the Vision product on his knowledge of other similar products, including another successful system he had helped develop, manufacture, and distribute.

In arguing that this evidence is speculative and failed to establish lost profits with reasonable certainty, VingCard and VCI generally dispute the facts which Formby relied on in making his projections. VingCard and VCI also challenge Merrimac's ability to produce the estimated 2,500 Vision units per year that Formby predicated his estimate on, citing Merrimac's problems with production over the term of the VingCard contract.

■ These matters were factual issues within the exclusive province of the jury. *See Bellefonte Underwriters Ins. Co. v. Brown,* 704 S.W.2d 742, 744–45 (Tex. 1986); *Clary Corp. v. Smith,* 949 S.W.2d

452, 466–67 (Tex.App.—Fort Worth 1997, pet. denied). The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Jones v. Tarrant Util. Co.*, 638 S.W.2d 862, 866 (Tex.1982). The trier of fact may resolve conflicts and inconsistencies in the testimony of any one witness as well as the testimony of different witnesses. *Webb v. Jorns*, 488 S.W.2d 407, 411 (Tex.1972). This court cannot substitute its judgment or its opinion for that of the jury. *Lofton v. Tex. Brine Corp.*, 720 S.W.2d 804, 805 (Tex.1986).

We conclude Formby's testimony of $3 to $3.5 million in lost profits from the Vision product was based on objective facts, figures, and data, and that his many years of experience in the touch-screen based computer industry, along with VingCard's existing worldwide customer base and marketing capabilities provide sufficient reasons to expect that the Vision product would yield a profit.

### The Aloha Product

With respect to the Aloha product, VingCard and VCI claim that, since Puzas' testimony was erroneously admitted and Dr. Self's testimony and report was based only upon data and information given to him by Formby, the evidence supporting lost profits on the Aloha unit rested solely on Formby's testimony. VingCard and VCI then argue Formby's testimony was based on mere speculation, not on objective facts and data as required to support a claim for lost profits.

We have already concluded that Formby's testimony regarding lost sales on the Aloha product was both competent and based on objective facts and information. We reject VingCard's and VCI's arguments to the contrary and their reliance on *Holland v. Hayden*, 901 S.W.2d 763, 766 (Tex.App.—Houston [14th Dist.] 1995, writ denied) (holding lost profits not recov-

erable based on service station owner's subjective and conclusory testimony that his contemplated convenience store would make at least four times his service station profits), and *Texas Instruments, Inc. v. Teletron Energy Management, Inc.*, 877 S.W.2d 276, 279 (Tex.1994) (holding lost profits not recoverable because the product was never actually produced and there was no evidence anyone was capable of making the product). In this case, unlike *Holland* and *Texas Instruments*, Formby's testimony was based upon: Ibertech's existing market, client base, and sales force; Ibertech's established sales record; an existing and extensive marketing plan; an existing product with existing sales; and Formby's years of experience in the industry, including direct experience with products very similar to the Aloha product. Because Formby's lost profits estimation on the Aloha product was based upon objective facts and data, his testimony provided proof of lost profits with reasonable certainty.

Formby testified that he expected to net $7 million in profits from the Aloha product. When added to his estimated $3 to $3.5 million in lost profits from the Vision product, Formby testified that Merrimac lost an estimated $10 to $10.5 million as a result of VingCard's and VCI's conduct.

Dr. Self calculated total damages at $11.9 million. Before performing his calculations, he gathered information about the businesses and industries, reviewed financial statements, cash-flow analyses, profit-loss statements, and pertinent court documents. He also reviewed Merrimac's past tax returns and discussed the case with Formby. Dr. Self based his calculations on the following considerations: existing contracts between Merrimac and both VingCard and Ibertech; Merrimac was an existing business with a history of profits; Formby's history of successfully

developing and marketing flat-screen workstations for service industries; VingCard and Ibertech were existing businesses with histories of profitability; existing markets for the Vision and Aloha products; existing sales of the Vision and Aloha products; and VingCard's existing customer base.

VingCard and VCI presented no contradicting evidence on lost profits.

■■■ We conclude that from this evidence the jury could have determined that Merrimac was a profitable company and that through its affiliations with VingCard and Ibertech was capable of generating the sales and profits shown by the evidence. The jury's award of $10.6 million in lost profits is within the range of Formby's $10 to $10.5 million calculation of lost profits and Dr. Self's $11.9 million calculation. A fact finder may award damages anywhere within the range of evidence presented at trial. *Clary Corp.*, 949 S.W.2d at 467. Accordingly, we hold there is both legally and factually sufficient evidence to support the jury's award of lost profits. We overrule VingCard's and VCI's second issue.

### Jury Charge

In issues six and seven, VingCard and VCI complain of the trial court's refusal to submit a requested jury issue and instruction.

■■■ A trial court has broad discretion in submitting cases to a jury upon broad-form questions. *Paul Mueller Co. v. Alcon Labs., Inc.*, 993 S.W.2d 851, 853 (Tex.App.—Fort Worth 1999, no pet.). A trial court's refusal to submit a properly requested question or instruction constitutes an abuse of discretion only if it acts without reference to any guiding rules or principles. *Tex. Dep't of Human Srvs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990).

Even if a trial court abuses its discretion in refusing to submit a question or instruction, the aggrieved party must establish harm for the error to constitute reversible error. *See, e.g., Adams v. Petrade Int'l, Inc.*, 754 S.W.2d 696, 716–17 (Tex.App.—Houston [1st Dist.] 1988, writ denied); *Rogers v. Gonzales*, 654 S.W.2d 509, 515 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.).

### Breach of Contract

In its sixth issue, VingCard contends the trial court erred in refusing its requested jury issue on excuse with regard to Merrimac's breach of contract claim. VingCard requested the following issue on its "excuse" defense:

Was VingCard, a.s.'s violation excused?

A party's violation of a contract is excused by the other party's prior unexcused violation of a material obligation of the contract.

VingCard's pleadings asserted Merrimac's "prior material breach" as both an affirmative defense and a counterclaim. Under either its defense or counterclaim, the controlling issue for the jury was the same: whether Merrimac violated a material obligation of the agreement before VingCard terminated the agreement. The trial court submitted VingCard's counterclaim issue asking whether Merrimac "fail[ed] to fulfill" the agreement and "fail[ed] to cure the non-fulfilling element(s), if any, within a reasonable amount of time."

■■■ A single, broad form question may relate to multiple legal theories to avoid the risk that the jury will become confused and answer questions inconsistently. *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex.1999). While the trial court's questions should obtain fact findings on all theories pleaded and sup-

ported by evidence, a trial court is not required to, and should not, confuse the jury by submitting differently worded questions that call for the same factual finding. *Id.* at 665–66.

 Here, the trial court's decision to submit a broad form issue regarding Merrimac's breach of the agreement subsumed both VingCard's affirmative defense of excuse and its counterclaim for breach of contract. By finding Merrimac had not violated any material obligation of the VingCard contract, the jury necessarily found that VingCard's termination of the agreement was not excused. Because the submitted charge allowed consideration of VingCard's affirmative defense of excuse, we conclude the trial court did not abuse its discretion in refusing VingCard's requested issue on excuse. *See id.* at 665; *J.V. Harrison Truck Lines, Inc. v. Larson,* 663 S.W.2d 37, 40 (Tex.App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.). We overrule VingCard's sixth issue.

**Tortious Interference**

VingCard and VCI raise two issues in their seventh issue. First, they contend the trial court erred in refusing their proposed jury instruction on their justification defense to tortious interference. VingCard and VCI also complain about the jury's failure to make an affirmative finding on their good faith belief defense.

 Justification is an affirmative defense to tortious interference based on either the exercise of (1) one's own legal rights, or (2) a good faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken. *Tex. Beef Cattle Co. v. Green,* 921 S.W.2d 203, 211 (Tex.1996). Whether a defendant has a legal right or a colorable legal right to interfere with a contract is a question of law within the exclusive province of the trial court. If a legal right to interfere

with the contract exists, then a defendant conclusively establishes its justification defense and the motivation behind assertion of that right is irrelevant. *See id.* at 211. If the defendant cannot establish a legal right as a matter of law, it may prevail on its justification defense if: (1) the trial court determines that the defendant interfered while exercising a colorable legal right, and (2) the jury finds that, although mistaken, the defendant exercised the colorable legal right in good faith. *Id.* A jury question is presented only when the court decides that although no legal right to interfere exists, the defendant produced some evidence of a good faith, albeit mistaken, belief in a colorable legal right. *Id.*

VingCard and VCI requested the trial court to submit a two-part instruction on their justification defense: "[a] third-party is privileged to interfere with another's contract if the interference results from the good-faith exercise of a party's rights *or if a party possesses an interest in the subject matter equal or superior to that of the other party.*" [Emphasis added]. The trial court refused VingCard's and VCI's requested instruction, instead submitting a good faith issue from the Texas Pattern Jury Charge. Because the trial court submitted a good faith issue, we address VingCard's and VCI's complaint with regard to the trial court's failure to submit the second part of their requested instruction.

The second part of VingCard's and VCI's requested instruction addressing a party's equal or superior right to the subject matter of the contract goes to the issue of whether they had a legal right or a colorable legal right to interfere with the contract. Because this was an issue of law for the trial court, we hold the trial court did not abuse its discretion in refusing VingCard's and VCI's requested instruction on their justification defense. *See id.*

We next turn to VingCard's and VCI's complaint about the jury's failure to find they had a good faith belief they could interfere with Merrimac's contracts. In support of this complaint, VingCard and VCI again point to their arguments regarding Merrimac's breaches of contract, which they contend establish a good faith belief they had a right to cancel the workstation agreement and, therefore, deal directly with both CapRock and DFI.

■ We have already upheld the jury's findings that VingCard breached the workstation agreement and that its breach was not excused by any material breach by Merrimac. From the same evidence that supported the jury's finding on these issues, the jury could have also determined that VingCard and VCI did not have a good faith belief they could interfere with Merrimac's contracts. As shown above, the jury could have determined that all curative actions had been completed prior to VingCard's April 1998 order for additional Vision units, that no further termination or cure demand notices were sent to Merrimac, that Merrimac delivered units within the seven percent failure rate specified in the parties' agreement, and that VingCard did not terminate the workstation agreement in accordance with its terms. Additionally, the jury could determine from VingCard's internal documents that VingCard planned over a long period of time to terminate its agreement with Merrimac, and that it knew the proper method for terminating the workstation agreement under its terms. Absent a proper termination, the jury was free to conclude that VingCard and VCI did not have a good faith belief they could interfere with Merrimac's contracts. Accordingly, we cannot say that the jury's failure

to make this finding was against the great weight and preponderance of the evidence. We overrule VingCard's and VCI's seventh issue.

### Attorney's Fees

In issues three and four, VingCard complains about the attorney's fees awarded to Merrimac.[3] VingCard first argues that the award for attorney's fees should be remanded upon reversal of the lost profits award because the fees were based on a percentage of the lost profits awarded. Because we have upheld the jury's finding of lost profits, this argument fails.

### Presentment

■ VingCard also contends, in its fourth issue, that the trial court erred in awarding attorney's fees to Merrimac because the evidence failed to show that Merrimac made a proper presentment of its claim under section 38.002(2) of the Texas Civil Practice & Remedies Code. The issue of whether a party is entitled to recover attorney's fees is a question of law for the court to determine, while the amount to be awarded is a question of fact for the jury. *Holland v. Wal–Mart Stores,* 1 S.W.3d 91, 94 (Tex.1999); *Great Am. Reserve Ins. Co. v. Britton,* 406 S.W.2d 901, 907 (Tex.1966).

■ Section 38.002(2) requires that a party seeking attorney's fees "present the claim to the opposing party or to a duly authorized agent of the opposing party." TEX. CIV. PRAC. & REM.CODE ANN. § 38.002(2) (Vernon 1997). While no particular form of presentment is required, a claimant must both plead and prove presentment to recover attorney's fees. The purpose of presentment is to allow the person against whom the claim is asserted an opportunity

---

3. Attorney's fees were awarded on the breach of contract claim, and only VingCard was found liable for breach of contract. Thus, only VingCard complains about the attorney's fees.

to pay a claim within 30 days after they have notice of the claim without incurring an obligation for attorney's fees. *Jones v. Kelley*, 614 S.W.2d 95, 100 (Tex.1981). The statute is to be liberally construed to promote its underlying purpose. TEX. CIV. PRAC. & REM.CODE ANN. § 38.005; *Jones*, 614 S.W.2d at 100. Thus, various forms of presentment have been held sufficient. *See Jones*, 614 S.W.2d at 100 (holding that letter and telephone conversation informing sellers of buyers' intentions to go through with sale of property met requirements of presentment); *Criton Corp. v. Highlands Ins. Co.*, 809 S.W.2d 355, 358 (Tex.App.—Houston [14th Dist.] 1991, writ denied) (holding that oral request to tender full performance under contract, which was refused, sufficient to establish presentment); *Richard Gill Co. v. Jackson's Landing Owners' Ass'n*, 758 S.W.2d 921, 926–27 (Tex.App.—Corpus Christi 1988, writ denied) (holding that demand letter and testimony that demand was made and turned down was sufficient to establish presentment); *Welch v. Gammage*, 545 S.W.2d 223, 226 (Tex.Civ.App.—Austin 1976, writ ref'd n.r.e.) (holding that request for admission and its response in which party admitted refusal to pay a claim sufficient to establish presentment).

Merrimac argues it "presented" its claim in an October 13, 1998 letter, wherein Formby advised VingCard of legal action if any actions were taken to "subvert" Merrimac's position as the exclusive manufacturer under the contract. Merrimac claims this letter demanded that VingCard honor the workstation agreement or face legal action and was more than sufficient to satisfy the presentment requirement of section 38.002.

■ VingCard, on the other hand, argues that presentment can only be made "after" the breach. Because the purported "presentment letter" was sent before VingCard's October 16, 1998 termination letter, VingCard contends Merrimac's October 13 letter cannot satisfy the presentment requirement. We disagree. Presentment necessary for the recovery of attorney's fees may be made either before or after filing suit, provided it is made at least thirty days before judgment. *Sterling Const. Co. v. West Tex. Equip. Co.*, 597 S.W.2d 515, 518 (Tex.Civ. App.—Amarillo 1980, no writ); *Stafford v. Brennan*, 498 S.W.2d 703, 706 (Tex. Civ.App.—Corpus Christi 1973, no writ).

■ In this case, VingCard was warned by Merrimac that it would take legal action if anyone, which included VingCard, did anything to "subvert" its exclusive manufacturing rights under the contract. This shows Merrimac's intent to continue performance under the workstation agreement. Additionally, several of VingCard's internal documents admitted into evidence, including a meeting agenda memo regarding an October 8, 1998 meeting between DFI and VingCard, shows VingCard was fully aware of possible legal action from Merrimac if it terminated the parties' agreement. The meeting agenda memo also shows VingCard knew Merrimac's damages would be in the form of "lost revenue." VingCard ignored Merrimac's warning, and despite its own acknowledgment of a possible claim by Merrimac, terminated the contract, as well as Merrimac's exclusive manufacturing rights. Additionally, counsel for VingCard and VCI admitted to the trial court during trial that VingCard, VCI, and Merrimac engaged in settlement negotiations regarding the case shortly after the suit was filed, which negotiations continued "through the early part of 1999," and that the reason they were in court was "because the parties could not reach an amicable agreement...." Moreover, Merrimac's discovery responses, provided more than

30 days before trial, show Merrimac's claim for breach of contract, the basis of the claim, and its claims for lost profits damages, including Dr. Self's lost profits calculations report.

Under these facts, we conclude the evidence is adequate to inform VingCard of Merrimac's claim for breach of contract and satisfies presentment of Merrimac's claim under section 38.002(2). Particularly, in light of the admissions by VingCard's counsel and the liberal construction of section 38.002, VingCard should not now be heard to argue that Merrimac's claim was not properly presented. As the prevailing party at trial, Merrimac is entitled to an award of reasonable attorney's fees in this case. We overrule VingCard's fourth issue.

**Reasonable and Necessary Attorney's Fees**

VingCard next contends, in its third issue, that Merrimac's trial counsel's testimony is both legally and factually insufficient to support the attorney's fees award for preparation and trial of the case, and that his testimony is legally insufficient to support the award of appellate attorney's fees.[4] VingCard argues that counsel's testimony does not meet the Texas Supreme Court's pronouncement on what constitutes probative evidence of reasonable attorney's fees under *Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812 (Tex.1997).

■ In *Arthur Andersen*, the supreme court concluded that evidence of a contingency fee agreement alone cannot support an award of reasonable and necessary attorney's fees. *Id.* at 818. While a contingency fee contract should be considered by the factfinder, the factfinder should also be guided by the other factors from the Rules of Professional Conduct governing fees. *Id.;* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(b), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (Vernon 1998). A party "cannot simply ask the jury to award a percentage of the recovery as a fee because without evidence of the factors identified in Disciplinary Rule 1.04, the jury has no meaningful way to determine if the fees were in fact reasonable and necessary." *Arthur Andersen*, 945 S.W.2d at 818–19. The court held that a party must prove that the amount of fees was both reasonably incurred and necessary to the prosecution of the case, and must ask the jury to award the fees in a specific dollar amount, not as a percentage of the judgment. *Id.* at 819.

VingCard argues that Merrimac's counsel ran afoul of this holding by asking the jury to calculate attorney's fees only as a percentage of the judgment, rather than based on any specific dollar amount. VingCard also argues that Merrimac presented insufficient evidence of the rule 1.04 factors.

■ In addition to proving the existence of a contingency fee contract, Merrimac's counsel outlined the rule 1.04 factors and provided information regarding each factor. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04. Counsel testified that the 30 percent contingency fee agreed upon in this case was less than the contingency fee charged in similar cases. He testified that out of this fee he would pay all expenses, including repayment of the $10,000 in expenses already paid by Merrimac, as well as co-counsel's attorney's fees in the case. Counsel explained to the jury how to calcu-

4. In its motion for rehearing, VingCard contends it challenged both legal and factual sufficiency of the evidence with regard to appellate attorney's fees. VingCard's brief, however, summarily raises only a legal sufficiency challenge to the appellate attorney's fees.

late fees based on the amount of damages they awarded. Specifically, counsel stated that if the jury awarded $10 million in damages, his fee should be $3 million based on the 30 percent contingency fee.

With respect to appellate attorney's fees, counsel testified that the contingent fee should increase to 35 percent in the event the case was appealed to the court of appeals and to 38 percent in the event of an appeal to the supreme court, which was less than that customarily charged in cases such as this by most other attorneys with comparable abilities. Counsel further testified that, based upon the rule 1.04 factors, his requested fees were ordinary, customary, and reasonable for the work both his firm and co-counsel had performed in the case. He then testified that 60 percent of the work done on the case went towards the breach of contract claim. Therefore, 60 percent of his requested fees would be reasonable and customary for the work done on the breach of contract claim.

VingCard presented no direct controverting evidence on the issue of attorney's fees. Rather, VingCard attempted to show, through cross-examination of Merrimac's counsel, that Merrimac's requested attorney's fees were unreasonable by comparing the requested amount with the number of hours actually spent, fees actually incurred, and fees already collected from Merrimac. Based upon Merrimac's counsel's testimony, the jury was asked to award "in dollars and cents" reasonable and necessary attorney's fees for the breach of contract claim. The jury awarded Merrimac attorney's fees in the amount of $2,067,000 for preparation and trial, $2,400,000 for an appeal to the court of appeals, and $2,600,000 for a petition for review to the supreme court. Apparently construing the jury's answers as cumula-

tive, the trial court reduced the appellate fee awards to $333,000 and $200,000, respectively.

VingCard appears to argue that, even though the jury issue complied with the mandate in *Arthur Andersen* by not asking the jury to award fees as a percentage of the judgment, counsel violated this rule by asking that fees be calculated as a percentage of the amount awarded. We do not believe this is the holding in *Arthur Andersen.*

In that case, the trial court awarded attorney's fees calculated only as a percentage of recovery under a contingent fee contract. *Arthur Andersen*, 945 S.W.2d at 818. There was no evidence presented on how the rule 1.04 factors affected the fees in that case. Here, counsel's testimony allowed the jury to consider the rule 1.04 factors in making their attorney's fees award. While counsel did ask the jury to calculate the fees as a percentage of the damages awarded, he based the percentages on the rule 1.04 factors and the fact that the fee award would also cover all expenses and co-counsel's attorney's fees. The jury was free to reject his requested percentages under the issue submitted, which required them to award only a specific dollar amount. We conclude that the evidence and record in this case met the requirements set forth in *Arthur Andersen* and that counsel's testimony provided the jury with sufficient evidence to make a determination as to Merrimac's reasonable and necessary attorney's fees. *Cf. Mid–Century Ins. Co. v. Boyte*, 49 S.W.3d 408, 416 (Tex.App.—Fort Worth 2001, pet. filed) (holding attorney's testimony regarding attorney's fees was sufficient to show that the fees incurred were reasonable and necessary); *Transcontinental Gas Pipeline Corp. v. Texaco, Inc.*, 35 S.W.3d 658,

675–76 (Tex.App.—Houston [1st Dist.] 2000, pet. filed) (holding sufficient evidence for the jury to award contingency fee to party's attorneys). Accordingly, we hold there was both legally and factually sufficient evidence to support the attorney's fees awarded. We overrule VingCard's third and fourth issues.

## CONCLUSION

Having overruled each of VingCard's and VCI's issues on appeal, we affirm the trial court's judgment.