COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.  2-03-156-CV

 

 

TOSHIBA MACHINE CO., AMERICA                                        APPELLANT

 

                                                   V.

 

SPM FLOW CONTROL, INC.                                                     APPELLEE

 

                                              ------------

 

           FROM
THE 236TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                OPINION
ON REHEARING

 

                                              ------------

After reviewing Appellant,
Toshiba Machine Co., America=s motion for rehearing, we deny the motion.  We withdraw our June 2, 2005 opinion and
judgment and substitute the following.  Our
ultimate conclusions remain unchanged.

I.                   
Introduction








            This case arises from the sale of two large machine
tools.  Toshiba Machine Company of
America (AToshiba@) appeals a $9.25 million judgment  on a jury verdict in favor of S.P.M. Flow
Control, Inc. (ASPM@). 
In twelve issues, Toshiba complains of legally insufficient evidence to
support jury findings on various aspects of SPM=s
breach of contract claims, mutually exclusive and inconsistent theories of
recovery, overlapping damage awards, and excessive attorney=s fees. 
In a single issue, SPM complains that the trial court used the wrong
date to compute prejudgment interest.  We
affirm the judgment in all respects.

II.                
Factual and Procedural
Background

            SPM manufactures heavy-duty oilfield pumps.  The pumps consist of two components:  a Apower
end@ and a Afluid
end.@  SPM makes the fluid ends from blocks of solid
steel weighing 3,000-4,000 pounds.  The
fluid ends have a complex internal shape machined through a process called Ainternal contouring.@ 








In 1996, SPM began to shop for new machine tools
to make fluid ends.  The machines SPM
used at the time dated from the 1960s and required 115 hours to make a single
fluid end.  SPM=s
primary goal in replacing the old machines was to reduce the time required to
make a fluid end.  SPM enlisted the help
of Maruka, U.S.A., Inc., a machine tool distributor, to find suitable replacements.  Maruka presented SPM with literature and
quotes for several machine tools, including Toshiba=s
BMC 1000 Horizontal Machining Center (ABMC-1000").


SPM initially rejected Toshiba=s quote because the BMC-1000 lacked the
ability to perform internal contouring. 
Soon thereafter, however, Toshiba informed SPM that it had developed new
software for the BMC-1000 that made internal contouring possible.  Toshiba called the software, and the process
it controlled, Aorbit
boring.@  Toshiba told SPM that Toshiba customers in
Japan were already using the orbit-boring software on BMC-1000 machines. 

Toshiba represented that orbit boring on the
BMC-1000 could make fluid ends in much less time than SPM=s existing tools.  According to Toshiba, orbit boring allowed
one cutting tool to do the work of many. 
The time saved by not having to change cutting tools would, said
Toshiba, reduce the time needed to a make a fluid end, even though the cutting
speed of the BMC-1000 was slower than that of SPM=s
existing equipment.  SPM employees
testified that Toshiba employees said, at various times before and after the
sale, that orbit boring would allow SPM to make a fluid end in anywhere from
fifteen to fifty hours.








A key issue at trial was what the term Aorbit boring@
meant.  According to SPM=s president, Dan Lowrance, Toshiba
promoted orbit boring, also called Ashake
turning,@ as a new
process that would bring new functionality to the BMC-1000.  According to Toshiba=s
regional sales manager, Steve Oliphant, orbit boring on the BMC-1000 was simply
a combination of older techniques called AHale
Interpolation@ and AArchimedes Interpolation.@ 
Complicating the issue, Toshiba=s
parent company in Japan developed a new Aconcept@ machine tool, the NX-76, to showcase
what it touted as a Arevolutionary@ new processCa
process also called Aorbit
boring.@  The parties hotly disputed whether shake
turning on the BMC-1000 was the same process as orbit boring on the NX-76.  SPM argued that Toshiba sold SPM orbit boring
but delivered Hale and Archimedes Interpolation.  Toshiba argued that orbit boring and shake
turning were two names for the same process, regardless of which machine was
involved.

In December 1997, SPM issued a purchase order for
a BMC-1000 that Toshiba had available for immediate delivery.  SPM=s
purchase order incorporated a proposal from Maruka in which Maruka listed Aorbit machining@
as a $20,000 option, and stipulated that Toshiba would provide a five-year
warranty on A[o]rbit
machining software, including support, updates and revisions as they become
available.@  SPM also attached to the purchase order a
list of terms captioned AAddendum
>A=.@ 
Those terms included the following:

$          Toshiba would machine a fluid end on a
BMC-1000 from a raw forging that SPM had already shipped to Japan, and provide
to SPM the data gathered during the machining process;








$          Toshiba would provide a process cycle
time, i.e., the time it should take to machine a fluid end on the BMC-1000;

 

$          Toshiba would provide the technical
support and training needed to make a fluid end on the BMC-1000; and

 

$          SPM=s
acceptance of the BMC-1000 was conditioned on the successful production of a
fluid end on the machine at SPM=s
factory.

 

Toshiba accepted SPM=s
purchase order and down payment without commenting on Addendum A.  Toshiba delivered the BMC-1000 to SPM=s factory in March 1998.  Significantly, Toshiba delivered the machine
without the software needed to perform orbit boring. 

In late April 1998, Toshiba sent a programmer,
Takeshi Ohki, to install orbit boring software on the BMC-1000 at SPM=s factory.  Ohki testified that this was the first time
he had attempted to combine Hale Interpolation and Archimedes Interpolation to
create the orbit boring function on a BMC-1000. He was unable to make the
software perform to SPM=s
requirements and returned to Japan. 

Soon after Ohki left SPM, Toshiba=s Steve Oliphant sent a memorandum to
Tony Tani, Toshiba=s
assistant general manager, raising several issues related to the BMC-1000.  Oliphant wrote:

 

 








SPM
is a Beta site for this very unique [orbit boring] software.

 

Orbit
Boring vs Hale Interpolation:  There
seems to be some confusion as to the definition and capabilities of these two
programs.  In the beginning we were told
that the Orbit Boring option was available and process descriptions were
supplied to the field.  This was sold to
SPM . . . .  What further complicates
this definition issue is that Mr. Oki [sic] told [Maruka] that Orbit and Hale
were two different things and that the BMC1000 was not capable of Orbit. 

 

On May 8, 1998, SPM complained that the BMC-1000
did not perform as expected and requested written confirmation that the machine
could produce fluid ends.  Toshiba
replied that Ohki would return to Fort Worth later in May and again attempt to
install the orbit boring software.  Ohki
returned to SPM on May 18, but still the BMC-1000 could not perform internal
contouring.  Around the same time, SPM
offered to return the machine to Toshiba in exchange for a refund of its down
payment if Toshiba had any concern about the BMC-1000's ability to
perform.  Toshiba promised that a
software solution was imminent.

Meanwhile, SPM ordered a second machine tool from
Toshiba in late July.  This second tool,
the BMC-800, was slightly smaller than the BMC-1000 but had the same purported
functionalityCincluding
orbit boring.  Toshiba advised SPM that
it would not ship the BMC-800 until SPM paid the $742,500 balance due on the
BMC-1000.  On August 10, SPM paid the
BMC-1000 balance.  








Five days later, Toshiba sent SPM an Aacceptance@
of the BMC-800 purchase order.  The
acceptance stated that Athere
is no orbit boring software@
and Athere
will never be any revisions or updates@
to the software provided with the BMC-800. 
When SPM confronted Toshiba about these statements, Toshiba dismissed
them as a miscommunication.  Toshiba said
it planned to showcase the orbit boring software along with the new NX-76 at a
Chicago tool show in September.  SPM
would receive the software immediately after the show, promised Toshiba. 

SPM sent a representative to the Chicago tool
show.  Toshiba did exhibit orbit boring
on the new NX-76, but told SPM=s
representative that the NX-76 software would not be available for the BMC-1000
until January. 

SPM and Toshiba continued to wrangle over the BMC
performance issues, and especially the orbit boring software, for another
year.  As late as May 13, 1999, Toshiba=s Oliphant sent a memorandum to SPM
promising delivery of the orbit boring software within two months.  SPM, Maruka, and Toshiba scheduled a meeting
at SPM=s factory
for August 1999.  At the meeting, Toshiba
definitively announced that SPM would not receive the orbit boring software. 








From June 1998, when the BMC-1000 became
operational at SPM, until November 2001, SPM used the Toshiba machines
extensively to help make fluid ends. 
Although the lack of orbit boring software made the Toshibas useless for
internal contouring, they could be used for rough machining.  Using the Toshiba machines for 15,000 hours
in conjunction with 18,600 hours on other machines, SPM produced 344 fluid ends
at the average rate of 100 hours per fluid endCdown
from 115 hours per fluid end before the Toshibas went online, but far longer
than the fifteen to fifty hours predicted by Toshiba.

When Toshiba announced that SPM would not receive
the orbit boring software, SPM began to shop for machines to replace the
Toshibas.  In May 2000, SPM purchased the
first of two machine tools from Toshiba rival Goss Trevisan.  The first Goss went online in July 2000.  A second Goss went online in May 2001.  In November 2001, SPM stopped using the
Toshiba machines altogether.  SPM offered
testimony at trial that the Goss machines could produce a complete fluid end in
thirty-four hours. 

In February 2000, SPM sued Toshiba for fraud,
negligent misrepresentation, breach of contract and breach of warranty.[1]  Toshiba counterclaimed for the unpaid balance
of the BMC-800. 








The case was tried to a jury.  SPM claimed three broad categories of
damages:  refund of the $898,200 SPM paid
for the two Toshiba machines; $969,945 in incidental expenses for items such as
pouring foundations for the Toshiba machines and time spent designing tools for
the Toshiba machines; and $6,038,492 in lost profits. 

The jury returned a verdict in favor of SPM on
every cause of action.  SPM elected to
recover on the basis of its breach of contract claim, for which the jury
awarded SPM $3,003,613 for each machine, for a total of $6,007,226.  The issue of attorney=s
fees was submitted to the trial court by agreement of the parties.  The trial court found that SPM was entitled
to $1.5 million in attorney=s
fees through the date of judgment, plus additional fees if Toshiba
unsuccessfully appealed the trial court=s
judgment.  The trial court also found
that SPM was entitled to prejudgment interest beginning on the day SPM filed
suit through the date of judgment.  Both
parties appealed.

III.              
Discussion

            a)         Toshiba=s
Issues

                        i)          Did SPM accept the machines as a matter of law? 








            A threshold question in this case,
and key to several of Toshiba=s
issues, is whether SPM accepted or rejected the Toshiba machines.  The jury found that SPM accepted but later
revoked its acceptance of the BMC-1000 and failed to find that SPM accepted the
BMC-800.  In its second issue, Toshiba
argues that there is no evidence to support the jury=s
finding that SPM revoked its acceptance of the BMC-1000, and there is
conclusive evidence that SPM accepted the BMC-800.  The gist of Toshiba=s
argument is that SPM=s
extensive use of the BMC machinesC17,000
hours of use over four yearsCconstitutes
acceptance and precludes revocation of acceptance as a matter of law.  We disagree.

a.                  
Standards of
review

                                                (a)        No evidence








We review the jury=s
finding that SPM revoked its acceptance of the BMC-1000 under the Ano evidence@
standard.  In determining a Ano evidence@
issue, we are to consider only the evidence and inferences that tend to support
the finding of the disputed fact and disregard all evidence and inferences to
the contrary.  Bradford v. Vento, 48
S.W.3d 749, 754 (Tex. 2001); Cont=l
Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996); In re
King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).  Anything more than a scintilla of evidence is
legally sufficient to support the finding. 
Cont=l
Coffee, 937 S.W.2d at 450; Leitch v. Hornsby, 935 S.W.2d 114, 118
(Tex. 1996).  More than a scintilla of
evidence exists if the evidence furnishes some reasonable basis for differing
conclusions by reasonable minds about the existence of a vital fact.  Rocor Int=l,
Inc. v. Nat=l Union
Fire Ins. Co., 77 S.W.3d 253, 262 (Tex. 2002).  A Ano
evidence@ issue
may only be sustained when (1) the record discloses a complete absence of
evidence of a vital fact, (2) the court is barred by rules of law or of
evidence from giving weight to the only evidence offered to prove a vital fact,
(3) the evidence offered to prove a vital fact is no more than a mere
scintilla, or (4) the evidence establishes conclusively the opposite of a vital
fact.  Uniroyal Goodrich Tire Co. v.
Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526 U.S.
1040 (1999).

(1)              
Matter of law

We review the jury=s
failure to find that SPM accepted the BMC-800 under the Aas
a matter of law@
standard.  When an appellant attacks the
legal sufficiency of an adverse answer to an issue on which he had the burden
of proof, the appellant must overcome two hurdles.  Victoria Bank & Trust Co. v. Brady,
811 S.W.2d 931, 940 (Tex. 1991).  First,
the record must be examined for evidence that supports the finding, while
ignoring all evidence to the contrary.  Dow
Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001).  Second, if there is no evidence to support
the finding, then the entire record must be examined to see if the contrary
proposition is established as a matter of law.  Id.; Sterner v. Marathon Oil Co.,
767 S.W.2d 686, 690 (Tex. 1989).  The
issue should be sustained only if the contrary proposition is conclusively
established.  Dow Chem., 46 S.W.3d
at 241-42.

 








b.                 
Analysis

            Where
goods fail to conform to the contract, the buyer may reject or accept the
goods.  Tex.
Bus. & Com. Code Ann. '
2.601 (Vernon 1994).  A buyer=s rejection or acceptance of
nonconforming goods determines the 
remedies available him.  Id. '' 2.711, 2.714 (Vernon 1994); Southwestern
Bell Tel. Co. v. FDP Corp., 811 S.W.2d 572, 576 (Tex. 1991) (op. on reh=g); Paul Mueller Co. v. Alcon Labs.,
Inc. 993 S.W.2d 851, 855 (Tex. App.CFort
Worth 1999, no pet.).

A buyer accepts goods if he agrees to accept them
despite their nonconformity, fails to make an effective rejection, or does any
act inconsistent with the seller=s
ownership.  Tex. Bus. & Com. Code Ann. '
2.606 (Vernon 1994).  Where a buyer
accepts goods with knowledge of a non-conformity, the buyer may not revoke
acceptance unless the acceptance was made on the reasonable assumption that the
non-conformity would be seasonably cured. 
Id. '' 2.607(b), 2.608(a)(1) (Vernon 1994). 
Where a buyer accepts goods without knowledge of a non-conformity, the
buyer may revoke its acceptance if acceptance was reasonably induced either by
the difficulty of discovery before acceptance or by the seller=s assurances.  Id. ' 2.608(a)(2).








Rejection of goods must occur
within a reasonable time after their delivery. 
Id. ' 2.602(a) (Vernon 1994). 
Likewise, revocation of acceptance must occur a reasonable time after
the buyer discovers the grounds for revocation.  Id.
' 2.608(b).  Whether rejection or
revocation occurred within a reasonable time depends on the facts of a
particular case.  Id. ' 1.205(a) (Vernon Supp. 2004-05) (providing that A[w]hether a time for taking an action required by this title is
reasonable depends on the nature, purpose, and circumstances of the action.@); Purnell v. Guar. Bank, 624 S.W.2d 357, 359 (Tex. App.CDallas 1981, writ ref=d n.r.e.) (holding that whether thirty-month delay precluded
revocation of acceptance of defective pleasure boat was a fact question); Don=s Marine, Inc. v. Haldeman, 557 S.W.2d
826, 829 (Tex. App.CCorpus
Christi 1977, writ ref=d n.r.e.).

After rejection or revocation
of acceptance, any exercise of ownership by the buyer with respect to the goods
is wrongful as against the seller.  Tex. Bus. & Com. Code Ann. ' 2.602(b)(1).








As noted above, the gist of
Toshiba=s argument is that SPM=s extensive use of the BMC machinesC17,000 hours of use over four yearsCconstitutes acceptance and precludes revocation of acceptance as a matter
of law.  According to Toshiba, use equals
irrevocable acceptance because it is an act inconsistent with Toshiba=s ownership under ' 2.606(a)(3) and a wrongful exercise of ownership under ' 2.602(b)(1).  Toshiba cites
several Texas and foreign cases to support its argument.  Generally, these cases stand for the
proposition that a buyer who exercises dominion and control over nonconforming
goods accepts those goods.  See, e.g.,
Bacchus Indus., Inc. v. Frontier Mech. Contractors, 36 S.W.3d 579, 585
(Tex. App.CEl Paso
2000, no pet.) (holding that buyer who made substantial repairs and
modifications to air conditioning units accepted them as a matter of law); Danjee,
Inc. v. Addressograph Multigraph Corp., 262 S.E.2d 665, 669-70 (N.C. Ct.
App. 1980) (stating in dicta that revocation not available to buyer who, with
full knowledge of defects, used printing presses for a Along period of time@ and never attempted to reject them or revoke acceptance);
Explorers Motor Home Corp. v. Aldridge, 541 S.W.2d 851, 853-54 (Tex. App.CBeaumont 1976, writ ref=d n.r.e.) (holding that buyers who traveled 14,000 miles in motor home
over two years did not effectively reject the motor home); Bowen v. Young,
507 S.W.2d 600, 603-04 (Tex. App.CEl Paso 1974, no writ) (holding that buyer who moved into
nonconforming mobile home and converted its heater from electric to gas
accepted the home as a matter of law).













But the cases cited by
Toshiba do not give a complete answer to the question of whether Ause equals acceptance@ under the UCC.  Most courts
have indicated that whether the buyer=s continued use of goods undoes a purported rejection or revocation of
acceptance depends upon whether the use was reasonable.  Anderson
on the Uniform Commercial Code, ' 2-608:281 (2004); Williston on
Contracts, '' 40:19,
40:30 (4th ed.).  What constitutes
reasonable use is a question of fact to be decided under the circumstances of
each case, but courts generally hold that using goods during the time when the
seller is promising or trying unsuccessfully to cure the nonconformity will not
adversely affect the buyer=s rights.  Williston on Contracts, ' 40:30; see Aluminum Line Prods. Co. v. Rolls-Royce Motors, Inc.,
649 N.E.2d 887, 894 (Ohio Ct. App. 1994) (holding that buyer was not precluded
from revoking acceptance of automobile after three years and 15,000 miles of
use when seller made repeated attempts to repair the vehicle, and buyer=s continued use after revocation did not undo revocation);[2]
N. Am. Lighting, Inc. v. Hopkins Mfg., Inc., 37 F.3d 1253,
1258-59 (7th Cir. 1994) (holding seller=s repeated promises to update software for headlight testing apparatus
justified buyer=s use of
apparatus during two-year delay in revoking acceptance); Wilk Paving, Inc.
v. Southworth Milton, Inc., 649 A.2d 778, 782 (Vt. 1994) (holding buyer=s continued use of asphalt paving machine after revocation of
acceptance was reasonable where the seller continued to assure buyer that
seller could repair machine); Four Sons Bakery, Inc. v. Dulman, 542 F.2d
829, 832 (10th Cir. 1976) (holding seller=s repeated assurances that it would fix commercial oven justified continued
use of oven after revocation of acceptance). 
As the Seventh Circuit held in North American Lighting, a Ause equals acceptance@ argument

comes
dangerously close to suggesting a rule that would allow sellers to >lock
in=
purchasers of goods by promising them the moonConly
to bring them back to earth when they attempted to

revoke
the acceptance that they were persuaded to give because of their failure to
fully understand a substantial defect.

N. Am. Lighting, 37 F.3d at 1258-59.  








Other factors relevant to a
buyer=s reasonable use of nonconforming goods include the degree of economic
hardship the buyer would suffer if it discontinued using the defective goods
and the reasonableness of the buyer=s use after revocation as a method of mitigating damages.  Liarikos v. Mello, 639 N.E.2d 716, 719
(Mass. 1994) (holding that continued use of automobile after revocation of
acceptance was reasonable where buyer relied on car to run her business).  Use of nonconforming goods may be the most
appropriate means of achieving mitigation until the buyer can obtain suitable
replacements.  Fablok Mills, Inc. v.
Cocker Mach. & Foundry Co., 310 A.2d 491, 494 (N.J. Super. Ct. App.
Div. 1973) (holding two-year delay in revocation of acceptance and extensive
use by buyer of defective knitting machines was reasonable, during which seller
attempted to fix the machines on many occasions); see Deere & Co. v.
Johnson, 271 F.3d 613, 619-20 (5th Cir. 2001) (applying Mississippi law and
holding that farmer=s continued
use of defective tractor after revoking acceptance was reasonable because
tractor was essential to farmer=s work, replacement was difficult to obtain, and farmer mitigated his
damages by using the tractor).








In our case, Toshiba agreed
to provide the orbit boring function with both BMC machines.  SPM=s president, Dan Lowrance, testified that Toshiba delivered the
BMC-1000 in March 1998 without the software needed to perform orbit
boring.  Lowrance testified that SPM
asked Toshiba about the missing orbit boring software soon after the machine
arrived.  According to Lowrance, Toshiba
assured SPM that its programmer would travel to SPM=s factory Avery quickly@ and install the software. 
Toshiba=s programmer
attempted but failed to install the software in April 1998 and again in May.
Lowrance testified that after the programmer=s first attempt, Lowrance told Toshiba=s assistant general manager, Tony Tani, that SPM would return the
BMC-1000 for a refund if Toshiba had any doubt about its ability to make fluid
ends.  Chris Wall, SPM=s director of manufacturing, admitted that SPM accepted the BMC-1000
when it paid the $742,500 balance due, but Lowrance testified that SPM paid the
balance only because Toshiba assured SPM that resolution of the orbit boring
problem was Aright around
the corner@ and refused
to ship the BMC-800 otherwise.   

Toshiba delivered the BMC-800
in September 1998.  Lowrance testified
that Toshiba=s Steve
Oliphant told him that SPM would receive the orbit boring software immediately
following the debut of the NX-76 in Chicago that same month.  Chris Wall testified that Oliphant told him
on September 18, 1998 that Toshiba was working on the orbit boring software and
would deliver it in January of the following year.  On May 13, 1999, Oliphant sent a memo to SPM=s George Reeve in which he stated that Toshiba would deliver orbit
boring software within two months.  Gene
Burkes, general manager of Maruka U.S.A., testified that he called Oliphant on
SPM=s behalf at least a dozen times between January and May 1999.  According to Burkes, Oliphant Akept saying the software is coming.@  In August 1999, Toshiba
announced that it would not deliver orbit boring software to SPM. 








Ray Gilbert, SPM=s vice president of finance, testified that the BMC machines were
worthless to SPM without the orbit boring function. Nevertheless, as detailed
later in this opinion under the issues of damages and mitigation, SPM cut the
time needed to make a fluid end from 115 hours to 100 hours by making what use
it could of the BMC machines, though the production time was far longer than
the fifteen to fifty hours SPM expected to achieve.  It is undisputed that SPM used the BMC
machines for 17,000 hours.

We note that it is unclear
from the record when and how SPM notified Toshiba that it was revoking its
acceptance of the BMC-1000 and rejecting the BMC-800.  But Toshiba does not complain of lack of
notice, so we will not dwell on this point.








We turn to the question of
SPM=s revocation of acceptance of the BMC-1000 under section 2.608.  The non-conformity identified by SPM was the
lack of the orbit boring function. 
Gilbert testified that the lack of orbit boring substantially impaired
the BMC-1000's value to SPM.  The jury
could reasonably conclude that SPM did not discover the non-conformity until
Toshiba announced in August 1999 that it would not deliver the orbit boring
software, and that SPM=s failure to
discover the non-conformity was induced by Toshiba=s many assurances that it would deliver the orbit boring
software.  Both Toshiba=s assurances and SPM=s use of the BMC-1000 to mitigate its damages until it could obtain
replacements tend to support the conclusion that SPM=s extensive use of the BMC-1000 was reasonable, before and after SPM
revoked its acceptance.  Moreover, Chris
Wall testified that replacement machines suitable to SPM=s needs were not easy to obtain, and the replacement machines SPM
ultimately bought had a long lead time. 
Whether SPM=s use of the
BMC-1000 was reasonable was a fact question for the jury to decide.   The evidence supports the conclusion that
SPM=s use was reasonable.  We hold
that there was more than a scintilla of evidence to support the jury=s finding that SPM revoked its acceptance of the BMC-1000.

With regard to the BMC-800,
the same factorsCToshiba=s repeated assurances of an imminent fix, SPM=s use of the BMC-800 to mitigate its damages, and the difficulty of
obtaining replacement machinesCtend to justify SPM=s use of, and delay in rejecting, the BMC-800.  We hold that there is more than a scintilla
of evidence to support the jury=s failure to find that SPM accepted the BMC-800.

We overrule the part of
Toshiba=s second issue that concerns acceptance of the BMC machines (the same
issue raises other complaints, which we address in the next section of this
opinion).  This conclusion is the
starting point for our analysis of Toshiba=s other issues.

2.                 
Did Toshiba
breach the contracts? 








            Also in its second issue, Toshiba contends that even if
SPM rejected the machines, there is no evidence that Toshiba breached sales
contracts.  Toshiba argues that its
failure to deliver orbit boring software cannot give rise to a breach of
contract claim and that there is no evidence to support the jury=s finding that Toshiba breached the
contracts.  As a subissue, Toshiba argues
that Addendum A to the BMC-1000 contract was not a part of the agreement
between Toshiba and SPM and therefore could not give rise to a breach of
contract claim.

a.                  
Was Addendum A
part of the contract?

            The jury found that Toshiba and SPM intended to Abind themselves to an agreement
regarding the BMC-1000 that included all provisions contained in Addendum A@ to SPM=s
purchase order.  Toshiba argues that
there is no evidence to support the jury=s
finding.

Toshiba relies on section 2.207 of the Texas
Business and Commerce Code.  Tex. Bus. & Com. Code Ann. ' 2.207 (Vernon 1994).  Section 2.207, captioned AAdditional Terms in Acceptance or
Confirmation@ and
often referred to as the Abattle
of the forms@ section
of the UCC, provides in part as follows:

            (a) A definite and seasonable expression of acceptance or
a written confirmation which is sent within a reasonable time operates as an
acceptance even though it states terms additional to or different from those
offered or agreed upon, unless acceptance is expressly made conditional on
assent to the additional or different terms.(b) The additional terms are to be
construed as proposals for addition to the contract.  Between merchants such terms become part of
the contract unless:

(1)
the offer expressly limits acceptance to the terms of the offer;

 








(2)
they materially alter it; or

 

(3)
notification of objection to them has already been given or is given within a
reasonable time after notice of them is received.

 

(c)
Conduct by both parties which recognizes the existence of a contract is
sufficient to establish a contract for sale although the writings of the
parties do not otherwise establish a contract. 
In such case the terms of the particular contract consist of those terms
on which the writings of the parties agree, together with any supplementary
terms incorporated under any other provisions of this title.

 

Significantly, Toshiba does not argue that Maruka=s December 16, 1997 proposal to SPM was
an offer.  Nor does Toshiba point to any
other writing that it claims was an offer accepted by SPM=s purchase order.  Rather, Toshiba contends that this case is
governed by section 2.207(c); according to Toshiba, the writings of the parties
do not establish a contract.








Toshiba=s
argument fails because SPM=s
purchase order was an offer to buy the BMC-1000.  The ATerms
and Conditions of Purchase@
recited on the back of the purchase order state that Toshiba=s shipment of the BMC-1000 constitutes
acceptance of the purchase order. 
Therefore, Toshiba accepted the purchase order when it shipped the
BMC-1000 to SPM.  The ATerms and Conditions of Purchase@ also state that acceptance of the
purchase order is acceptance of all terms on the front and back of the purchase
order.  And the merger clause on the back
of the purchase order recites that A[t]his
purchase order, and any documents referred to on the face hereof,
constitute the entire agreement between the parties.@  (Emphasis added.)  The front of the purchase order specifically
refers to Addendum A.  George Reeve, the
SPM employee who generated the purchase order and Addendum A, testified that he
discussed the specific terms of the addendum with Toshiba=s Oliphant and Maruka=s Davenport during a three-hour phone
conference on December 9, 1998  and that
Toshiba never objected to the Addendum A terms after it received the purchase
order.  We hold that SPM adduced more
than a scintilla of evidence to support the jury=s
finding that Addendum A was part of the contract.

b.                 
Is there any
evidence of breach?

            Next, Toshiba argues that there is no evidence to support
the jury=s finding
that it breached the contracts.  In the
same subissue, Toshiba claims that its delivery of the BMC machines to SPM
precludes a breach of contract claim, even if the machines were missing
critical features.  We disagree.








The remedies available to a buyer under the UCC
depend on whether the buyer accepts or rejects the goods in question.  See Tex.
Bus. & Com. Code Ann. '' 2.711, 2.714.  If a buyer rejects goods (or revokes
acceptance), the buyer is entitled to the remedies set forth in sections 2.711
and 2.713.  Id. ' 2.713 (Vernon 1994).  If, on the other hand, a buyer accepts goods,
the buyer=s remedy
is determined by section 2.714.  Because
a buyer cannot accept what a seller does not deliver, delivery of goods is a
necessary predicate to acceptance or rejection; but delivery by itself does not
determine the buyer=s
remedies.  Assuming the seller delivers something,
the buyer=s
acceptance or rejection determines the buyer=s
remedies.

It is undisputed that Toshiba delivered the BMC
machines to SPM.  The jury found that SPM
rejected the BMC-800 and revoked its acceptance of the BMC-1000.  The question, then, is whether SPM produced
any evidence to support the jury=s
finding that Toshiba breached the contracts.

A seller breaches a contract if its delivery fails
in any respect to conform to the contract. 
Id. '
2.601.  This is sometimes referred to as
the Aperfect
tender@
rule.  Tex. Imps. v. Allday, 649
S.W.2d 730, 737 (Tex. App.CTyler
1983, writ ref=d
n.r.e.).  Conformity does not mean
substantial performance; it means complete performance.  Printing Ctr., Inc. v. Supermind Publ=g Co.,  669 S.W.2d 779, 783 (Tex. App.CHouston [14th Dist.] 1984, no writ).








SPM identifies four specific contract items that
Toshiba failed to deliver:  the orbit
boring software, tool lists and part programs, process cycle time studies, and
a test run-off of a fluid end.  SPM
offered evidence that Toshiba failed to deliver these items.  Except for the orbit boring software, Toshiba
does not dispute its failure to deliver these items.  Therefore, SPM produced at least some
evidence to show that Toshiba=s
delivery did not conform to the contract in all respects.

We hold that Toshiba=s
delivery of the BMC machines does not preclude SPM=s
beach of contract claims and that there is some evidence to support the jury=s findings that Toshiba breached the
contracts.  We overrule Toshiba=s second issue.

3.                 
Damages

            Toshiba=s first, fourth, sixth, seventh, and
eleventh issues complain about  various
aspects of SPM=s
damages.

a.                  
Is there any
evidence to support SPM=s lost profits? 

            In issue 7a,[3]
Toshiba complains that there is no evidence to support SPM=s claim of lost profits.  In its closely-related issue 4, Toshiba
complains that the trial court erred by admitting the testimony of SPM=s damage witness, Ray Gilbert, on the
question of lost profit.  We disagree.













A party seeking to recover lost profits must prove
the loss through competent evidence with reasonable certainty.  Szczepanik v. First S. Trust Co., 883
S.W.2d 648, 649 (Tex. 1994); VingCard A.S. v. Merrimac Hospitality Sys.,
Inc., 59 S.W.3d 847, 863 (Tex. App.CFort
Worth 2001, pet. denied).  While this
test is a flexible one in order to accommodate the myriad circumstances in
which claims for lost profits arise, at a minimum, opinions or estimates of
lost profits must be based on objective facts, figures, or data from which the
amount of lost profits can be ascertained. 
Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc., 877 S.W.2d
276, 279 (Tex. 1994); Szczepanik, 883 S.W.2d at 649; VingCard A.S.,
59 S.W.3d at 863.  In other words, Areasonable certainty@ is not demonstrated when the profits
claimed to be lost are largely speculative or a mere hope for success, as from
an activity dependent on uncertain or changing market conditions, on chancy
business opportunities, or on promotion of untested products or entry into
unknown or unproven enterprises.  Teletron
Energy Mgmt., Inc., 877 S.W.2d at 279‑80; VingCard A.S., 59
S.W.3d at 863.  The mere assertion that
contracts were lost does not demonstrate a reasonably certain objective
determination of lost profits.  Holt
Atherton Indus., Inc. v. Heine, 835 S.W.2d 80, 85 (Tex. 1992).  Whether evidence is speculative or reasonably
certain is a factual issue within the exclusive province of the jury to
determine.  VingCard A.S., 59
S.W.3d at 863.  Reasonably certain lost
profits may be proved by relying on such factors as (1) the experience of the
business principals, (2) the nature of the business, (3) the nature of the
market, (4) the nature of the client base, (5) the sales force, (6) the
marketing plan, and (7) the company's track record of sales.  Id. at 864.  For example, when a business is already
established and making a profit at the time the contract was breached or the
tort committed, pre‑existing profit, together with other facts and
circumstances, may indicate with reasonable certainty the amount of profits
lost.  Teletron Energy Mgmt., Inc.,
877 S.W.2d at 279; Anthony Equip. Corp. v. Irwin Steel Erectors, Inc.,
115 S.W.3d 191, 204 (Tex. App.CDallas
2003, pet. dism=d).     Ray Gilbert, SPM=s
vice president of finance, was SPM=s
sole witness on damages.  To begin our
analysis, we will summarize Gilbert=s
testimony on the question of SPM=s
lost profits.

Gilbert broke SPM=s
lost profits into three components. 
First was the increased cost of producing the 344 fluid ends SPM made in
part on the Toshiba machines.  Gilbert
testified that it took SPM 34,025 hours to produce the 344 fluid ends.  From that he subtracted 12,040 hours, the
time it would have taken to produce 344 fluid ends if the Toshiba machines
could produce a fluid end in thirty-five hours. 
Gilbert then multiplied the remainder, 21,985 hours, by SPM=s Ashop
rate@ of $150
per hour, for a total of $3,297,750. Gilbert testified that $150 per hour was
the industry standard shop rate; he also produced calculations to show that the
shop rate was reasonably accurate for SPM. 








Gilbert=s
second category of lost profits stemmed from the sales of 296 fluid ends SPM
lost because it quoted prices too high or delivery times too long to suit its
customers.  Gilbert testified that SPM
lost these sales Abecause
the Toshibas didn=t perform
as represented and we had to quote longer deliveries and our prices were not
competitive because instead of doing it in 35 hours, we were up closer to 100
hours.@  He personally contacted customers who
cancelled orders or rejected SPM quotes to ascertain whether the cancellation
or rejection was due to SPM=s
price or delivery time.  Gilbert then
multiplied the gross sales lost because of price or delivery time by SPM=s 28.68% profit margin to compute SPM=s net lost profits.  Gilbert derived the profit margin from SPM=s consolidated financial statements for
the years 1994 through 2001.  While
Gilbert admitted that he did not know precisely what price or delivery time SPM
would have had to quote to make the sales in question, he opined that SPM would
have made the sales if the Toshiba machines could make a fluid end in
thirty-five hours.  He attributed a total
of $2,362,821 in lost profits to lost fluid end sales. 








Gilbert=s
third category of lost profit arose from lost sales of flow control productsCvalves, piping, and connectionsCthat SPM would have sold as part of its
lost fluid end sales.  Gilbert examined
SPM=s sales history to determine which
customers typically purchased flow control products along with pumps and fluid
ends.  He testified that the fluid end
sales SPM lost to those customers would have generated additional sales of
$1,317,022 in flow control products. 
Gilbert multiplied the lost flow control sales by SPM=s 28.68 percent profit margin for a
lost net profit of $377,721. 

Finally, Gilbert testified that SPM had the same
customer base for decades.  SPM sold the
same product lines Afor some
time,@ and
those product lines had always been profitable. 
He testified that SPM has turned a profit since at least 1991, the year
Gilbert joined the company. 

            Toshiba challenges Gilbert=s testimony on three grounds.  First, Toshiba argues that Gilbert did not
qualify as an expert.  A witness is
qualified to testify as an expert if he has the appropriate knowledge, skill,
experience, training, or education.  Roberts
v. Williamson, 111 S.W.3d 113, 121 (Tex. 2003); Tex. R. Evid. 702. The decision to admit expert testimony is
within the trial court=s
discretion and will be disturbed on appeal only if there has been an abuse of
that discretion.  Gammill v. Jack
Williams Chevrolet, Inc., 972 S.W.2d 713, 718-19 (Tex. 1998).  In this case, the specific subject matter of
Gilbert=s
testimony is SPM=s damages
arising from its purchase of the Toshiba machines.  The question we consider is whether Gilbert
has specialized knowledge that would assist the jury in understanding that
issue.  See Helena Chem. Co. v.
Wilkins, 47 S.W.3d 486, 500 (Tex. 2001).








Gilbert earned a BBA in accounting in 1968.  From 1968 to 1991 he worked as an accountant,
controller, and vice president of sales and finance for several companies.  In 1991, Gilbert went to work for SPM, first
as vice-president and general manager with full responsibility for SPM=s manufacturing, sales, marketing, and
accounting, then gradually narrowing his focus to sales and accounting as SPM=s vice president of finance.  He testified that he had more than thirty
years=
experience managing the financial and accounting functions of companies engaged
in the manufacture and distribution of various products.  After reviewing Gilbert=s testimony about his education, work
history, experience, and familiarity with SPM=s
business, we cannot say that the trial court abused its discretion by allowing
Gilbert to testify as an expert about SPM=s
damages.

Second, Toshiba argues that the trial court erred
by admitting Gilbert=s
testimony about lost sales because it was rife with inadmissible hearsay.  Gilbert testified that he personally
contacted SPM customers to ascertain why certain sales were lost or certain
orders cancelled.  Toshiba made timely
hearsay objections to Gilbert=s
testimony.








We review a trial court=s
rulings in admitting or excluding evidence under an abuse of discretion
standard.  Nat=l Liab. & Fire Ins. Co. v. Allen,
15 S.W.3d 525, 527 (Tex. 2000).  We must
uphold the trial court=s
evidentiary ruling if there is any legitimate basis in the record for the
ruling.  Owens-Corning Fiberglas Corp.
v. Malone, 972 S.W.2d 35, 43 (Tex. 1998).

An expert may rely on inadmissible facts or data
to form an opinion or inference if the facts or data are of a type reasonably
relied upon by experts in the particular field. 
Tex. R. Evid. 703; In
re A.J.L., 136 S.W.3d 293, 301 (Tex. App.CFort
Worth 2004, no pet.).  We cannot think of
a more appropriate method to determine why sales were lost than to ask the
customer.  We hold that the trial court
did not abuse its discretion by admitting this testimony.








Finally, Toshiba argues that Gilbert=s testimony about lost sales was purely
speculative because Gilbert failed to determine what price or delivery time
would have induced SPM=s
customers to buy fluid ends from SPM.   
We find no case law to support Toshiba=s
argument.  Measuring lost profits is an
inherently speculative undertaking.  Pena
v. Ludwig, 766 S.W.2d 298, 301 (Tex. App.C
Waco1989, no writ).  In Formosa
Plastics Corp. USA v. Presidio Engineers and Contractors, Inc., the Supreme
Court of Texas held that a hypothetical bid for a construction project was Aentirely speculative@ and legally insufficient to support an
award of lost profits because there was no evidence that the bid would have
been accepted.  960 S.W.2d 41, 50 (Tex.
1997).  But our case is readily
distinguishable from Formosa Plastics. 
In that case, there was evidence that two of the three other bids on the
same project were lower than the claimant=s
hypothetical bid; thus, the alleged lost profits Awere
based on an entirely hypothetical, speculative bargain that was never struck
and would not have been consummated.@  Id. 
There is no such evidence in our case. 
Moreover, the lost sales to which Gilbert testified concerned the loss
of sales of proven products to existing customers.  We hold that Gilbert=s
testimony regarding lost sales was not so speculative as to be legally
insufficient.

In sum, Gilbert testified that SPM lost profits of
$6,038,292.  As noted above, SPM also
claimed $970,000 in incidental damages. 
The jury awarded SPM a total of $6,007,226 on its breach of contract
claims.  Even if we assume that the jury
based its award solely on SPM=s
lost profits, we hold that Gilbert=s
testimony presented more than a scintilla of evidence to support the jury=s verdict.  Gilbert=s
testimony established SPM=s
lost profits to a reasonable certainty. 
We overrule Toshiba=s
issues 4 and 7a.

b.                 
Did SPM=s damage model result in a double recovery? 

            In its sixth issue, Toshiba argues that two of SPM=s damage elementsClost profits due to increased
production costs and lost profits due to lost salesCoverlap,
and to allow SPM to recover both results in an impermissible double
recovery.  We disagree.








Toshiba argues, and we agree, that both of Gilbert=s lost profit calculations hinge on the
speed of the Toshiba machines.  As
detailed above, SPM=s Gilbert
testified that SPM incurred more costs and lost profits on the fluid ends
actually produced because the Toshiba machines were slower than expected.  Likewise, SPM lost sales because it quoted
higher prices and longer delivery times to its customers based on the slower
than expected speed of the Toshiba machines. 
Had the machines performed as expected, SPM would have realized a higher
profit on the fluid ends actually made and sold and realized additional
sales.  But we disagree with Toshiba that
the fact that both damage elements arise from the speed of the Toshiba machines
necessarily means that the elements overlap.








To show that the elements overlap, Toshiba argues
that the extra hours needed to make the fluid ends actually produced are the
same hours SPM would have used to make additional fluid ends for additional
sales.  This may be true, but it misses
the point.  Toshiba confuses the issues
of time and profit.  The hours might be
the same, but the dollars are different. 
Under Gilbert=s
analysis, if the Toshiba machines had performed as expected, SPM would have
saved time and realized more profit on each of the fluid ends actually
produced.  With the time saved, SPM could
also have made and sold more fluid ends and made additional profit.  The time used to make fluid ends is the same,
but the lost profits are separate and distinct.

We overrule Toshiba=s
issue six.

 

c.                  
Did the trial
court err by submitting broad-form damage questions? 

            In its eleventh issue, Toshiba argues that the trial
court erred in failing to submit damage questions that provided separate blanks
for each element of SPM=s
damage model.  We disagree.

Toshiba=s
complaint about the damage submission turns on the proposition that a trial
court commits reversible error where it submits a broad-form damage issue that
incorporates an element of damages on which there is no evidence.  Harris County v. Smith, 96 S.W.3d 230,
234 (Tex. 2002).  Such a submission
prevents the appellate court from determining whether the jury based its
verdict on an improperly submitted element of damage.  Id. 
Toshiba identifies lost profits as the element of damage lacking
evidentiary support.

Toshiba=s
argument fails because we have already concluded that there is legally
sufficient evidence to support the jury=s
award, even if the entire award consists of lost profits.  We overrule Toshiba=s
eleventh issue.

 








d.                 
May SPM recover
both its purchase money and consequential damages?

            In its first issue, Toshiba argues that a party claiming
breach of contract may not recover both the purchase money paid under the
contractCwhat
Toshiba calls Arescission
damages@Cand consequential damages.  But SPM=s
purchase money was not submitted to the jury as an element of SPM=s contract damages.  Therefore, Toshiba=s
first issue is moot, and we need not consider it.  See Tex.
R. App. P. 47.1.

4.                 
Did SPM fail to
mitigate its damages? 

            In issue 7b, Toshiba argues that the trial court erred by
awarding damages that SPM could have avoided by cover or mitigation.  Toshiba claims that SPM did nothing to
mitigate its losses and therefore is barred from recovering any consequential
damages.








A buyer may recover consequential damages that
could not reasonably be prevented by cover. 
Tex. Bus. & Com. Code Ann.
' 2.715(b)(1) (Vernon 1994).  After a breach by the seller, the buyer may Acover@
by making, in good faith and without unreasonable delay, any reasonable
purchase of goods in substitution for those due from the seller.  Id. '
2.712(a).  To determine if a buyer
effected a proper attempt at cover, we consider Awhether
at the time and place the buyer acted in good faith and in a reasonable manner
. . . .@  Id. '
2.712, cmt 2.  A[I]t
is immaterial that hindsight may later prove that the method of cover used was
not the cheapest or most effective.@
 Id.  The burden of establishing that damages could
not have been reasonably prevented by cover is on the plaintiff.  Wilson v. Hays, 544 S.W.2d 833, 836
(Tex. Civ. App.CWaco
1976, writ ref=d
n.r.e.).

Mitigation of damages is a rule requiring the
injured party to use reasonable diligence to minimize his damages.  LTV Aerospace Corp. v. Bateman, 492
S.W.2d 703, 709 (Tex. Civ. App.CTyler
1973, writ ref=d
n.r.e.).  Though mitigation is similar to
cover, the burden of disproving mitigation lies with the defendant.

The trial court submitted the issues of cover and
mitigation to the jury as limiting instructions on the breach of contract
damage questions, as follows:

Do
not include in your answers any loss you find SPM could have avoided by the
exercise of reasonable care.  Do not
include in your answer any loss that occurred after the date that replacement
machining centers could have been reasonably obtained and installed by SPM. 

 

Toshiba=s
argument on cover amounts to a no-evidence issue; its argument on mitigation is
a conclusive evidence issue.  Under
either standard, we must affirm if there is more than a scintilla of evidence
in SPM=s favor.








With regard to cover, SPM produced evidence at
trial to show that it purchased two Goss Trevisan machines as cover when it
became clear that the Toshiba machines would not perform as represented.  Once both Goss Trevisan machines were fully
operational, SPM stopped using the Toshiba machines.  This is some evidence of that SPM made
reasonable efforts to limit its consequential damages and is enough to support
the jury=s award.

With regard to mitigation, SPM produced evidence
to show that it limited its damages by using the Toshiba machines to the extent
possible.  Although the Toshiba machines
did not perform as expected, they cut the time it took SPM to make a fluid end
from 115 hours to 100 hours.  This
fifteen hour savings, when multiplied by SPM=s
shop rate of $150 per hour, yielded a reduction in SPM=s
damages of $2,250 per fluid end.  Gilbert=s damage computation properly accounted
for this savings.








Toshiba argues that by using the Toshiba machines,
SPM aggravated its damages, not mitigated them. 
Toshiba reasons that SPM=s
damage model multiplied the number of hours SPM used the Toshiba machines by
the shop rate; thus every hour SPM used the Toshiba machines increased SPM=s damages by $150.  But SPM claimed no such thing.  SPM claimed as damages the difference between
100 hoursCthe time
it actually took a make a fluid end with the help of the Toshiba machinesCand thirty-five hoursCthe time Toshiba said it would take the
machines to make a fluid endCand
multiplied the difference by SPM=s
$150 per hour shop rate.  If SPM had not
used the Toshiba machines, its damages would have been the difference between
115 hours and thirty-five hours, multiplied by the $150 per hour shop
rate.  Thus, by using the Toshiba
machines, SPM mitigated its damages by $2,250C15
hours times the shop rateCfor
every fluid end produced.

We hold that SPM presented some evidence on the
question of cover and that Toshiba failed to prove conclusively that SPM did
not mitigate its damages.  We overrule
Toshiba=s issue
7b.

5.                 
Did the trial
court err in awarding attorney=s fees to SPM? 

            In its eighth issue, Toshiba complains that the trial
court erred by awarding attorney=s
fees to SPM.  Toshiba=s complaint has two components:  First, that SPM is not entitled to attorney=s fees because it did not prevail on
its breach of contract claim; and second, that the trial court impermissibly
enhanced SPM=s Alodestar@
attorney=s fees.








A party may recover reasonable attorney=s fees for a valid breach of contract
claim.  Tex.
Civ. Prac. & Rem. Code Ann. '
38.001 (Vernon 1997).  Texas courts weigh
the eight factors recited in rule 1.04 of the rules of professional conduct to
determine the reasonableness and necessity of attorney=s
fees.  Tex.
Disciplinary R. Prof'l Conduct 1.04(b), reprinted in Tex. Gov't Code Ann., tit. 2, subtit.
G, app. A (Vernon 2005) (Tex. State Bar
R. art. X ' 9); Miller
v. Kennedy & Minshew, Prof. Corp., 142 S.W.3d 325, 336-37 (Tex. App.CFort Worth 2003, pet. denied).  Those factors are  (1) the time and labor required, the novelty
and difficulty of the questions involved, and the skill required to perform the
legal services properly; (2) the likelihood that the acceptance of the
particular employment will preclude other employment by the lawyer; (3) the fee
customarily charged in the locality for similar legal services; (4) the amount
involved and the results obtained; (5) the time limitations imposed by the
client or by the circumstances; (6) the nature and length of the professional
relationship with the client; (7) the experience, reputation, and ability of
the lawyer or lawyers performing the services; and (8) whether the fee is fixed
or contingent on results obtained or uncertainty of collection before the legal
services have been rendered. Miller, 142 S.W.3d at 336-37.  One method of computing a reasonable fee is
the Alodestar@ method, or Athe
product of reasonable hours times a reasonable rate.@  City of Burlington v. Dague, 505 U.S.
557, 559, 112 S. Ct. 2638, 2640 (1992). 
We review a court-ordered award of attorney=s
fees under the abuse of discretion standard. 
Ridge Oil Co., Inc. v. Guinn Invs., Inc., 148 S.W.3d 143, 163
(Tex. 2004).








In this case, the issue of attorney=s fees was submitted to the trial
court, rather than the jury, by agreement of the parties.  SPM=s
lead counsel, Marshall Searcy, testified about SPM=s
attorney=s
fees.  SPM=s
fee agreement with Searcy=s
firm consisted of three elements.  First,
SPM paid Searcy=s firm a
flat fee of $150,000 up front.  Second,
SPM agreed to pay Searcy=s
firm 5% of SPM=s
ultimate recovery, if any.  Third, SPM
agreed that Searcy=s firm
could keep any attorney=s
fees awarded by the trial court.  SPM
argues that this third provision contemplates a fee higher than the flat
$150,000 plus 5%, contingent upon whether the trial court awarded attorney=s fees.

Searcy testified that the services his firm
rendered to SPM had a lodestar value of $667,114.  He then testified that a reasonable fee would
be $1.5 million.  To support a reasonable
fee in excess of the lodestar value, Searcy testified at length about the rule
1.04 elements.  Most significantly,
Searcy testified that the risk his firm took of losing the case and receiving
nothing over its $150,000 base fee 
justified the $1.5 million fee. 
He also testified that the lodestar value would represent a reasonable
fee if SPM had paid his firm on a monthly basis; but since his firm had to wait
until the conclusion of the case to collect its fee, the lodestar value was
insufficient.  Finally, Searcy testified
that $1.5 million represented about 25% of the jury=s
verdictCsignificantly
less than the 30%-50% typically charged by Tarrant County attorneys in
contingent fee cases.  








The trial court made findings of fact and
conclusions of law that specifically took into account the rule 1.04
factors.  The trial court found that the
following attorney=s fees
were reasonable:  $1.5 million through the
date of judgment, plus $200,000 if Toshiba is unsuccessful in this appeal, plus
$35,000 if Toshiba files a petition for review with the Supreme Court of Texas
and the petition is denied, or $65,000 if the Supreme Court grants the petition
but rules against Toshiba on the merits. 
The trial court incorporated these fees into its judgment. 

Toshiba lodges two complaints about SPM=s attorney=s
fees.  First, Toshiba contends that SPM
is not entitled to any award of attorney=s
fees because SPM did not prevail on its breach of contract claim.  We have already concluded that SPM may
recover for breach of contract; therefore, SPM may also recover its reasonable
attorney=s
fees.  See Tex. Civ. Prac. & Rem. Code Ann. '
38.001.








Second, Toshiba argues that the trial court erred
by awarding more than the lodestar amount. 
To support this argument, Toshiba cites Dague, 505 U.S. at 557,
112 S. Ct. at 2638, and PPG Industries, Inc. v. JMB/Houston Centers Partners
Ltd. P=ship,
41 S.W.3d 270 (Tex. App.CHouston
[14th Dist.] 2001, no pet.), rev=d
on other grounds, 146 S.W.3d 79 (Tex. 2004).  The question in Dague was whether
the attorney=s fees
shifting provisions of the federal Solid Waste Disposal Act and Clean Water Act
permitted Aenhancement@ of lodestar attorney=s fees where the attorney=s fees were contingent.  Dague at 559, 112 S. Ct. at 2639.  The Supreme Court held that such enhancement
was not permitted under the statutes in question.  Id. at 567, 112 S. Ct. at 2648.  Since this case involves neither of those
statutes, Dague offers little guidance and imposes no restrictions
here.  Moreover, Texas courts
consistently allow the use of a multiplier based upon the contingent nature of
a fee under Texas statutes allowing recovery of attorney's fees.  Dillard Dept. Stores, Inc. v. Gonzales,
72 S.W.3d 398, 413 (Tex. App.CEl
Paso 2002, pet. denied).

Nor is Toshiba=s
argument supported by PPG Industries. 
In that DTPA case, the trial court awarded a Abonus@ of $300,000 on top of the plaintiff=s lodestar attorney=s fee. 
PPG Indus. 41 S.W.3d at 285. 
The court of appeals held that the trial court had no authority to
consider the result obtained as a basis for awarding the bonus against the
defendant.  Id.  But the court went on to affirm the bonus
because there was some evidence, besides the result obtained, to show that the
attorney=s fee,
including the bonus, was reasonable.  Id.  The court concluded that the trial court had
not abused its discretion in awarding the bonus.  Id.

In our case, as in PPG Industries, there is
some evidence that the trial court=s
award of attorney=s fees to
SPM is reasonable.  We hold that the
trial court did not abuse its discretion by awarding those fees to SPM.  We overrule Toshiba=s
eighth issue.

 

 








6.                 
Did the trial
court err by failing to submit Toshiba=s counterclaim to the jury? 

            In its ninth and tenth issues,
Toshiba argues that the trial court erred by failing to submit Toshiba=s counterclaim to the jury and failing
to direct the verdict on the counterclaim. 
Toshiba sued SPM for the unpaid balance of the BMC-800.  The amount of the unpaid balance, $658,800,
was not disputed.

A buyer must pay at the contract rate for any
goods accepted.  Tex. Bus. & Com. Code Ann. '
2.607(a).  Toshiba argues that it was
entitled to a directed verdict on its counterclaim because SPM accepted the
BMC-800 as a matter of law.  But the jury
failed to find that SPM accepted the BMC-800, and we have already concluded
that Toshiba failed to prove acceptance as a matter of law.  Thus, Toshiba was not entitled to a directed
verdict.

Nor did the trial court err by refusing to submit
Toshiba=s
counterclaim to the jury.  Since the
amount of the counterclaim was undisputed, the only question for the jury to
decide was whether SPM accepted the BMC-800. 
If the jury had found that SPM accepted the machine and did not revoke
its acceptance, Toshiba would be entitled to judgment for the amount of its
counterclaim.  But because the jury
failed to find that SPM accepted the BMC-800, SPM is not liable for the unpaid
balance.

We overrule Toshiba=s
ninth and tenth issues.

 








7.                 
SPM=s non-contract claims

            In its third and fifth issues, Toshiba argues that the
trial court erred by submitting SPM=s
breach of warranty, fraud, and negligent misrepresentation claims to the
jury.  Because we affirm the judgment on
SPM=s breach of contract claims, we need
not consider these two issues.  See
Tex. R. App. P. 47.1.

B.                
SPM=s Issue:  When
did prejudgment interest begin to accrue?

            In its sole issue, SPM complains that the trial court
chose the wrong date from which to calculate prejudgment interest.  The trial court chose February 29, 2000, the
date SPM filed suit.  SPM contends that
prejudgment interest began to accrue on May 3, 1999, 180 days after SPM sent
Toshiba what SPM claims was notice of its claims.  The difference is significant; using the
earlier date yields an additional $493,000 in prejudgment interest.








Prejudgment interest accrues on the amount of a
judgment during a period that begins on the earlier of the 180th day after the
date a defendant receives written notice of a claim against it, or the date the
suit is filed.  Tex. Fin. Code Ann. '
304.104 (Vernon Supp. 2004-05).  Although
section 304.101 states that A[t]his
subchapter applies only to a wrongful death, personal injury, or property
damage case,@ the
Supreme Court of Texas has extended the notice provision of section 304.104 to
all claims.  Id. ' 304.101; Johnson & Higgins of
Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 531 (Tex. 1998).

A Aclaim@ under section 304.104 is a demand for
compensation or an assertion of a right to be paid.  MCN Energy Enters., Inc. v. Omagro de
Colombia, L.D.C., 98 S.W.3d 766, 773 (Tex. App.CFort
Worth 2003, pet. denied).  A claim need
not demand an exact amount or list every element of damage.  Bevers v. Soules, 909 S.W.2d 599, 603
(Tex. App.CFort
Worth 1995, no writ).

1.                 
Standard of
review








            Before we turn to the merits of SPM=s issue, we must determine what
standard of review to apply.  In MCN
Energy Enterprises, we wrote that A[t]he
date from which statutory prejudgment interest should begin is a question of
law that an appellate court must review de novo.@  98 S.W.3d at 773.  We cited as authority for that proposition Johnson
v. City of Fort Worth, 774 S.W.2d 653, 655‑56 (Tex. 1989).  Johnson did not concern prejudgment
interest; instead, it stands for the general proposition that Amatters of statutory construction are
questions of law for the court to decide rather than issues of fact.@ 
Id. at 656.  Implicit in Johnson,
and necessary to bridge the gap between Johnson and MCN Energy
Enterprises, is the rule that appellate courts review questions of law de
novo.  See, e.g., Graves
v. Alders, 132 S.W.3d 12, 17 (Tex. App.CBeaumont
2004, pet. denied).

On the other hand, we held that A[a] trial court's award of prejudgment
interest is reviewed under an abuse of discretion standard@ in Manufacturers Auto Leasing, Inc.
v. Autoflex Leasing, Inc., 139 S.W.3d 342, 348 (Tex. App.CFort Worth 2004, pet. denied).  Our sister courts generally hold the same.[4]

The San Antonio Court of Appeals described the
standard of review this way:

We
review a trial court's award of prejudgment interest under the abuse of
discretion standard. [Citation omitted.] 
Under this standard, we will not disturb a trial court=s findings on factual issues unless the
court reasonably could have reached only one decision and it failed to do
so.  Walker v. Packer, 827 S.W.2d
833, 839‑40 (Tex. 1992).  However, Aa trial court has no discretion in
determining what the law is or applying the law to the facts.@ 
Id. at 840.

 








J.C. Penney Life Ins. Co. v. Heinrich, 32 S.W.3d 280, 289
(Tex. App.CSan
Antonio 2000, pet. denied).  We conclude
that Heinrich correctly articulates the general standard for reviewing
an award of prejudgment interest.  The
abuse of discretion standard applies to the trial court=s
factual findings as they relate to prejudgment interest; but the de novo
standard applies to the trial court=s
application of the law to the facts.

In the case before us, the trial court=s award of prejudgment interest does
not hinge on any factual finding. 
Instead, the issue turns on the interpretation of a single letter from
SPM to Toshiba.  The existence and contents
of the letter are not in dispute. The question is whether the letter
constituted notice of SPM=s
claims as a matter of law.  Therefore, as
a practical matter, our review of the prejudgment interest issue in this case
is de novo.

2.                 
Facts and
analysis

            On November 4, 1998, SPM sent a letter to the president
of Toshiba Machine Co., Ltd. in Japan.[5]  SPM complained that the BMC machines 

will not perform to the specifications in the
machine literature or as represented by Toshiba . . . . [W]e are concerned that
the machines will never perform consistently to Toshiba=s
specifications and SPM=s
contract requirements.








The letter summarized twenty-one complaints about the BMC
machines and Toshiba=s
earlier responses to those complaints. 
SPM stated that it had incurred damages of $998,250 and continued to
incur damages at the rate of $5,775 for each day the machines did not perform.  SPM concluded its letter with these words:

SPM
is prepared to litigate the issues if necessary.  However, SPM prefers to resolve the issues if
the machines can perform to specification and contract requirements.  If this is not attainable, SPM prefers to
return the machines to Toshiba, with Toshiba to absorb SPM=s costs-to-date.

 

SPM contends that this letter was sufficient
notice of its claims to trigger accrual of prejudgment interest 180 days
later.  Toshiba responds that the letter
did not give notice of a claim because it did not make a demand for payment or
assert a right to be paid.








We look to similar cases for guidance.  In Bevers, we held that a signed
medical authorization form, coupled with a letter asking an insurance company
to Aproperly consider [plaintiff=s] injury claim,@
constituted notice.  Bevers, 909
S.W.2d at 603.  The Texarkana court
reached the same conclusion where a personal injury plaintiff, at the defendant=s request, signed a medical records
release form that stated, A[t]his
information is to be used for purposes of evaluating and handling my claim for
injury.@  K Mart Corp. v. Rhyne, 932 S.W.2d 140,
146 (Tex. App.CTexarkana
1996, no writ).  Likewise, the Austin
court held that a request from a plaintiff to a defendant=s insurance company asking the company
to pay certain medical bills, and inquiring when he would receive his next lost
wages check, was a Aclaim@ for purposes of prejudgment
interest.  Robinson v. Brice, 894
S.W.2d 525, 529 (Tex. App.CAustin
1995, writ denied).  More recently, the
Beaumont court concluded that letters requesting reimbursement for medical
treatment constituted written notice of a claim.  Brookshire Grocery Co., 99 S.W.3d at
825.

There is a key distinction between those cases and
the case now before us.  In each of those
cases, the claims asserted by the writings in question were certain and
unconditional.  The writings did not urge
the recipients to avoid a contingent, future liability, but to accept an
accrued, existing liability.  SPM=s letter does just the opposite.  SPM urges Toshiba to avoid a future claim by
curing the defects in the BMC machines. 
SPM does not demand payment or assert a right to be paid.  Instead, SPM suggests that it will assert a
claim and demand payment in the future if Toshiba cannot make its machines
perform to specification.

We hold that SPM=s
November 4, 1998 letter did not constitute notice of a claim as a matter of
law.  The trial court properly computed
prejudgment interest from the date SPM filed suit.  We overrule SPM=s
sole issue.

IV.             
Conclusion








            We
overrule Toshiba=s issues
two, four, and six through eleven.  We do
not reach Toshiba=s issues
one, three, and five.  We overrule SPM=s sole issue.  We therefore affirm the trial court=s judgment in all respects.  See Tex. R. App. P. 43.2(a).

 

 

ANNE GARDNER

JUSTICE

 

PANEL A:       CAYCE, C.J.; GARDNER and MCCOY, JJ.

 

DELIVERED:  November 10, 2005

 











[1]Toshiba
sued SPM in Illinois for the unpaid balance due on the BMC-800  in November 1999.  The Illinois trial court dismissed that suit
for lack of jurisdiction.





[2]Section
1.103 of the Texas Business and Commerce Code states that the Code should be
liberally construed Ato
make uniform the law among various jurisdictions.@  Tex.
Bus. & Com. Code Ann. ' 1.103(a)(3) (Vernon
1994).  Section 311.028 of the Texas
Government Code provides that A[a] uniform act . . . shall
be construed . . . to make uniform the law of those states that enact it.@  Tex.
Gov=t
Code Ann. ' 311.028
(Vernon 2005).  Thus, in determining and
applying the Texas version of the Uniform Commercial Code, we may consider and
apply pertinent decisions from other jurisdictions.  Rogers v. Ricane Enterprises, Inc.  930 S.W.2d 157, 171 (Tex. App.CAmarillo1996,
writ denied); Fin. Universal Corp. v. Mercantile Nat'l Bank, 683 S.W.2d
815, 817 (Tex. App.CDallas
1984, writ ref'd n.r.e.).

 





[3]Toshiba=s AIssues
Presented@
lists two issues numbered A7.@  We will refer to the first as A7a@ and
the second, discussed elsewhere in this opinion, as A7b.@





[4]See, e.g., Protective Life Ins. Co.
v. Russell, 119
S.W.3d 274, 288 (Tex. App.CTyler 2003, pet. denied); Brookshire Grocery Co. v.
Smith, 99 S.W.3d 819, 823 (Tex. App.CBeaumont 2003, pet. denied); Wilmer‑Hutchins ISD
v. Smiley, 97 S.W.3d 702, 706 (Tex. App.CDallas 2003, pet. denied); Purcell Constn., Inc. v.
Welch, 17 S.W.3d 398, 402 (Tex. App.CHouston [1st Dist.] 2000, no pet.) (AWe review a challenge to a trial
court's award of pre-judgment interest using an abuse of discretion standard,
giving limited deference to the court's application of the law to the facts.@); Marsh v. Marsh, 949
S.W.2d 734, 744 (Tex. App.CHouston [14th Dist.] 1997, no writ).





[5]Toshiba
points out that the letter is not addressed to Toshiba Machine Co., America,
but to its parent company, Toshiba Machine Co., Ltd.  But Toshiba does not complain that it did not
receive the letter, so the letter=s addressee is not a factor
in our analysis.